Thomas WILLIAMS, Commissioner of Revenue, and State of Alaska, Appellants,

v.

Ronald M. ZOBEL and Patricia L. Zobel, husband and wife, Appellees.

No. 5400.

Supreme Court of Alaska.

Oct. 24, 1980.

---

See also, Alaska, 619 P.2d 422.

Susan Burke, Asst. Atty. Gen., Avrum M. Gross, Sp. Asst. Atty. Gen., Wilson L. Condon, Atty. Gen., Juneau, for appellants.

Mark Sandberg, Camarot, Sandberg & Hunter, Anchorage, for appellees.

Robert C. Erwin, Erwin & Smith, Anchorage, for amicus curiae Kenai Peninsula Borough.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.

## OPINION

RABINOWITZ, Chief Justice.

This is an appeal from the summary judgment of the superior court which invalidated, as a matter of equal protection and the right of interstate migration, the permanent fund income distribution statute, AS 43.23.010-.100,[1] passed in April, 1980, by the Alaska legislature.[2] We reverse the superior court's summary judgment as to the permanent fund distribution statute.

In so doing, we are re-affirming our modification of the equal protection test which had traditionally been applied in the right-to-migrate context by this court.[3] Before discussing the permanent fund income distribution statute itself (section II), we review our reasons for modifying the test (section I).

I. The Federal and State Equal Protection Tests as They Relate to the Right of Interstate Migration

Initially, our analysis of state equal protection law tracked that of federal law by the United States Supreme Court closely in all areas, including that of classifications penalizing the exercise of the right of interstate migration.[4] As we used the tradition-

---

1. Ch. 21, SLA 1980.

2. The superior court also invalidated, on equal protection grounds, another statute establishing a system of tax exemptions based on prior filing of tax returns (ch. 22, §§ 1, 4–9, SLA 1980). In a separate set of opinions, we upheld that judgment. *Williams v. Zobel,* 619 P.2d 422 (Alaska 1980).

3. *See Hicklin v. Orbeck,* 565 P.2d 159 (Alaska 1977), *rev'd on other grounds,* 437 U.S. 518, 98 S.Ct. 391, 57 L.Ed.2d 397 (1978); *Gilbert v. State,* 526 P.2d 1131 (Alaska 1974); *State v. Adams,* 522 P.2d 1125 (Alaska 1974); *State v. Wylie,* 516 P.2d 142 (Alaska 1973); *State v. Van Dort,* 502 P.2d 453 (Alaska 1972).

4. The term "right to migrate" is used to emphasize that we are dealing with a possible limitation on the right to move into and settle in Alaska, not just the right to travel into the state.

al "two–tier" analysis[5] under our equal protection clause, there was no need to differentiate between the federal and state modes of analysis.

Following some broad language in the United States Supreme Court case of *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 Ed.2d 274 (1972),[6] we interpreted this line of cases as holding that any durational residency requirement[7] imposed a penalty on the right of interstate migration, and thus automatically invoked the "strict scrutiny" analysis:[8]

> All durational residency requirements inherently infringe upon the fundamental constitutional right of interstate travel. Hence, all such requirements are prima

facie invalid and will be countenanced only when they serve a compelling state interest.

*State v. Adams*, 522 P.2d 1125, 1131 (Alaska 1974) (footnotes omitted).

However, the United States Supreme Court made it clear that this interpretation was incorrect as a matter of federal equal protection law. In *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974), the Supreme Court, although invalidating that durational residency requirement, made it clear that some durational residency requirements would not penalize the right of interstate migration, and thus would not invoke strict scrutiny.[9] This was made even clearer in

The phrase 'right to travel' is often used. But in cases challenging durational residency requirements, the right at stake is to travel into a different state and make one's home there, not merely to travel. *Hicklin v. Orbeck*, 565 P.2d 159, 162–63 n.5 (Alaska 1977), *rev'd on other grounds*, 437 U.S. 518, 98 S.Ct. 391, 57 L.Ed.2d 397 (1978).

5. *See* Note, *Durational Residency Requirements: The Alaskan Experience*, 6 U.C.L.A.– Alaska L.Rev. 50, 52–53 (1976).

6. "In sum, durational residence laws must be measured by a strict equal protection test: They are unconstitutional unless the State can demonstrate that such laws are '*necessary* to promote a *compelling* governmental interest.' " *Dunn v. Blumstein*, 405 U.S. 330, 342, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274, 284 (1972), *quoting* (in part) *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600, 615 (1969) (emphasis in original).

7. A durational residency requirement, which draws a distinction between new and old residents based on the length of their residency, must be distinguished from a residency requirement, which draws a distinction between residents and nonresidents. Generally, a state has much more authority to draw distinctions between residents and nonresidents than between long– and short–term residents. *See Vlandis v. Kline*, 412 U.S. 441, 452–53, 93 S.Ct. 2230, 2236–2237, 37 L.Ed.2d 63, 72 (1973); *Fisher v. Reiser*, 610 F.2d 629, 635 (9th Cir. 1979). Distinctions based on residency requirements are generally analyzed under the privileges and immunities clause of the Federal Constitution, *see Hicklin v. Orbeck*, 437 U.S. 518, 98 S.Ct. 391, 57 L.Ed.2d 397 (1978), whereas durational residency requirements are traditionally analyzed under the equal protection or due process clauses, although this pattern does not always

hold true. *See, e. g., Baldwin v. Fish & Game Comm'n of Montana*, 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978).

8. We use "strict scrutiny" as a shorthand for the "necessary to promote a compelling state interest" test.

9. Although any durational residence requirement impinges to some extent on the right to travel, the Court in *Shapiro* did not declare such a requirement to be per se unconstitutional. The Court's holding was conditioned by the caveat that some 'waiting period *or* residence requirements ... may not be penalties upon the exercise of *the constitutional right of interstate travel*.' The amount of impact required to give rise to the compelling–state–interest test was not made clear.

> Although any durational residence requirement imposes a potential cost on migration, the Court, in *Shapiro*, cautioned that some 'waiting–period[s] ... may not be penalties.' 394 U.S. at 638 n.21, [89 S.Ct. at 1333 n.21] 22 L.Ed.2d 600. [footnotes and citations omitted] [emphasis in original]

*Memorial Hosp. v. Maricopa County*, 415 U.S. 250, 256–59, 94 S.Ct. 1076, 1081–1082, 39 L.Ed.2d 306, 314–15 (1974).

Additionally, both *Maricopa County* and the case of *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), indicated that the Supreme Court continued to approve of its summary affirmance of *Starns v. Malkerson*, 326 F.Supp. 234 (D.Minn.1970), *aff'd without opinion*, 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971), which upheld a one–year durational residency requirement for reduced tuition purposes. *Vlandis*, 412 U.S. at 452 n.9, 93 S.Ct. at 2236 n.9, 37 L.Ed.2d at 72 n.9; *Maricopa County*, 415 U.S. at 259 & n.12, 94 S.Ct. at 1082 & n.12, 39 L.Ed.2d at 315 & n.12.

the case of *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), which upheld a one–year durational residency requirement for filing a divorce petition. Thus, under federal law, a durational residency requirement does not automatically invoke strict scrutiny.

That our interpretation in this area was stricter than the federal interpretation is also shown by the rulings in our cases, which struck down durational residency requirements which the United States Supreme Court probably would have upheld. For example, in *State v. Adams*, 522 P.2d 1125 (Alaska 1974), we struck down a one–year durational residency requirement for eligibility to file for a divorce, very similar to the one upheld by the United States Supreme Court in *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975).[10]

Our cases, still functioning under the two–tier approach, continued to regard du-

rational residency requirements as automatically triggering strict scrutiny, and rejected the distinctions by which federal equal protection cases in this area separated strict scrutiny cases from rational basis cases.[11] Implicitly, our course was based on a recognition that removing these cases from the strict scrutiny approach would require that they be judged by a rational basis standard, which would give insufficient weight to the important right involved.[12] But the need for an "intermediate approach" between these two extremes [13] was apparent in an increased willingness to find a "compelling state interest," a very difficult standard to fulfill under federal law.[14]

In *State v. Erickson*, 574 P.2d 1 (Alaska 1978), we adopted a new equal protection analysis, using one uniform balancing approach rather than the two–tier approach which had been increasingly subjected to criticism on several grounds.[15]

---

**10.** Also, *compare State v. Van Dort*, 502 P.2d 453, 455 (Alaska 1972) (interpreting *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) as setting 30 days as the maximum permissible durational residency period for voter eligibility), *with Marston v. Lewis*, 410 U.S. 679, 93 S.Ct. 1211, 35 L.Ed.2d 627 (1973) (upholding Arizona's 50–day durational residency requirement for voter eligibility).

**11.** *See Hicklin v. Orbeck*, 565 P.2d 159, 163 (Alaska 1977), *rev'd on other grounds*, 437 U.S. 518, 98 S.Ct. 391, 57 L.Ed.2d 397 (1978): "We have never used this 'basic necessities' reasoning." The "basic necessities" rationale is one basis upon which the United States Supreme Court has distinguished strict scrutiny cases from rational basis cases in this area. *See* note 22 and accompanying text, *infra*.

**12.** Even after the court decided *Isakson v. Rickey*, 550 P.2d 359 (Alaska 1976), which replaced the old "rational basis" test with a more intensified means–to–end inquiry—the "fair and substantial relationship" test—the right of interstate migration would have been unduly denigrated by assignment to the lower tier. The test announced in *Isakson* was not intended to take into account the infringement which a classification might have on constitutionally protected interests.

**13.** To some extent, the Supreme Court's decision in *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), can be seen as reflecting this same need. The Court, although refusing to apply the strict scrutiny test, also

refrained from explicitly assigning the case to the rational basis tier. This was one basis for the dissent's criticism of the holding–that the opinion articulated no standard and instead used an "ad hoc balancing test." *Sosna*, 419 U.S. at 419, 95 S.Ct. at 567, 42 L.Ed.2d at 552 (Marshall, J., dissenting).

**14.** *See Dunn v. Blumstein*, 405 U.S. 330, 363–64, 92 S.Ct. 995, 1013, 31 L.Ed.2d 274, 296 (1972) (Burger, C. J., dissenting):

> Some lines must be drawn. To challenge such lines by the 'compelling state interest' standard is to condemn them all. So far as I am aware, no state law has ever satisfied this seemingly insurmountable standard, and I doubt one ever will, for it demands nothing less than perfection.

*Compare Hicklin v. Orbeck*, 565 P.2d 159, 163 (Alaska 1977), *rev'd on other grounds*, 437 U.S. 518, 98 S.Ct. 391, 57 L.Ed.2d 397 (1978): "We have never used the 'basic necessities' reasoning . . . . . On the other hand, our use of strict scrutiny has not always resulted in holding challenged laws unconstitutional."

**15.** The new balancing test has advantages over both tiers of the old test. At the lower end, the test replaces "virtual abdication" with "genuine judicial inquiry." *Isakson v. Rickey*, 550 P.2d 359, 363 (Alaska 1976). Where infringement of various rights is alleged, the test results in a "more flexible, less result–oriented analysis." *State v. Erickson*, 574 P.2d 1, 12 (Alaska 1978).

Since *Erickson*, and prior to our decision in *Zobel I*, we had decided two cases which involved the right of interstate migration, and in both the question of *Erickson*'s application to this area was postponed. *See Thomas v. Bailey*, 595 P.2d 1 (Alaska 1979); *Castner v. City of Homer*, 598 P.2d 953 (Alaska 1979).

In *Zobel I*, we announced our decision to apply *Erickson* to the right–to–migrate context.[16]

■ In our view the uniform balancing approach adopted in *Erickson* is much more appropriate in this context than the two–tier analysis used in our prior cases. Further, we will no longer regard all durational residency requirements as automatically triggering strict scrutiny and requiring a showing that such a classification is absolutely necessary to promote a compelling state interest. Instead, we will balance the nature and extent of the infringement on this right caused by the classification against the state's purpose in enacting the statute and the fairness and substantiality of the relationship between that purpose and the classification.[17]

■ In those situations in which federal law would apply strict scrutiny, this court must also. This divergence of the two sets of analyses will necessitate separate consideration of the permanent fund earnings distribution statute under federal and state equal protection law.

## II. The Permanent Fund Earnings Distribution System

The recent tremendous wealth bestowed upon Alaska by the development of oil and mineral resources has created governmental problems unique to this state. Both the original establishment of the permanent fund and the later statute establishing a system for distributing the earnings from the fund represent novel mechanisms to deal with this wealth.

The creation of the fund was a response to two specific concerns. First, the people of the state recognized that Alaska's oil and mineral wealth is based on nonrenewable resources which will become depleted at some point in the future, potentially leaving Alaska with the choice of either terminating certain governmental programs or continuing them through increases in taxation. The permanent fund channels some of the current wave of moneys into just what its name implies–a permanent fund, the earnings from which will help to defray the costs of government at that future time when the nonrenewable resources run out.

The second concern was the temptation to use the current flood of funds for costly, wasteful, and unnecessary government projects. Typically, some limit is placed on this tendency by the fact that funding for such programs must come from the taxpayers. With this damper removed, the people of Alaska recognized the need to substitute some other form of restraint. Thus, the constitutional provision establishing the fund places the principal of the fund beyond the legislature's appropriation power, which can be exercised only over earnings derived from the fund.

The legislature's subsequent decision to use its appropriation power over the earnings to distribute some of the earnings directly to Alaska residents was also unique. Undoubtedly, the legislature was aware that such action would be popular with its constituency. However, there is merit in the state's contention that there was an additional motive for choosing to distribute some of the earnings. The earnings alone have been substantial enough to engender concern over the unwarranted and "painless" growth of government. By distributing some of the fund's income directly to

---

**16.** *See Williams v. Zobel*, 619 P.2d 422, 427 (Alaska 1980) (plurality opinion); *Id.* at 431 n.1 (Rabinowitz, C. J., concurring); *Id.* at 439 (Connor, J., dissenting).

**17.** *See State v. Erickson*, 574 P.2d 1, 12 (Alaska 1978). We do not, by this holding, mean to indicate that we are retreating from the strict scrutiny test, or its equivalent under *Erickson*, where rights other than the right of interstate migration are involved–*e. g.*, rights to freedom of speech, privacy, etc.

residents, the state could insure that future legislatures will face a spending limit. To exceed this limit, the legislature would have to "take back" some of the fund's income distributed to Alaskans. This would, in effect, simulate a legislative choice to enact a tax.

The mechanism established to effect this distribution of earnings is as follows: one–half of the fund's earnings are to be distributed in dividends of at least fifty dollars.[18] To be eligible, a person must be eighteen years of age and a resident of Alaska. AS 43.23.010(b). There is no "durational residency" requirement; a bona fide resident of Alaska is immediately eligible for a pro rata portion of his or her first dividend. AS 43.23.010(f). However, the number of dividends received by an eligible person is determined by length of residency, with one dividend allowed for each full year of residency since statehood (1959). AS 43.23.-010(a). It is this connection between the length of residency and the number of dividends received which is at issue here.[19]

On April 28, 1980, Ronald and Patricia Zobel, residents of Alaska since 1978, filed suit challenging this statute on the ground that it violates the equal protection clauses of both the United States and Alaska Constitutions. On June 27, 1980, the superior court issued its decision declaring the stat-ute invalid under the equal protection clause of the Alaska Constitution. The state has appealed that decision to this court. Application of the *Erickson* test leads us to conclude that the statute is constitutional.

A. Federal Equal Protection Claim

■ As federal equal protection law still uses the two–tier analysis, the initial inquiry must be to determine which of the two standards is to be applied. Although the question is not a clear one, we conclude that the rational basis standard is applicable.[20]

We recognize that the United States Supreme Court applied a strict scrutiny analysis in the cases of *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), and *Memorial Hospital v. Maricopa County*, 415 U.S. 450, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974), and that there is language, particularly in *Dunn*, which indicates that any durational residency requirement automatically triggers the strict scrutiny analysis. But *Shapiro* and *Maricopa County* explicitly left open the possibility that there might be durational residency requirements which do not trigger strict scrutiny because they would not "penalize" the exercise of the

---

**18.** Under the statute, the amount of each dividend is calculated by dividing the income to be distributed (one–half of the annual interest income of the fund) by the total number of dividends to be distributed that year. AS 43.23.-030. If the income is insufficient to provide at least $50 per dividend, the legislature may appropriate money from the general fund as a loan to the dividend fund. AS 43.23.050.

**19.** We do not disagree with the dissent's characterization of the statute as a "durational residency requirement." To the extent that this term could be interpreted to mean that a period of residency is required for eligibility for participation in the program, as was the case in *Shapiro, Dunn,* and *Maricopa County*, the term would be a mischaracterization. However, the dissent makes it clear that this is not the case; rather, the statute gears the amount of benefits to length of residency. We think the term "durational residency link" more accurately characterizes this relationship, but as there is no dispute over the statute's operation, the

matter is only one of semantics, the resolution of which would not further analysis.

The relevant United States Supreme Court case law relied upon by the dissent on this point has dealt entirely with two-stage durational residency provisions–*i. e.*, those creating two classes, one eligible, one ineligible. We agree with the dissent that such periods cannot be unreasonably long. We deal here with a multi–stage durational residency provision. The dissent, drawing from the rulings that two–stage durational residency provisions must be reasonable, concludes that any multi–stage durational residency provision is impermissible. We think the more likely conclusion is that multi–stage durational residency provisions are to be assessed by the same principles and criteria as two–stage durational residency provisions, and as such they are not automatically impermissible.

**20.** *See* section I *supra*.

right of interstate migration; and the strict scrutiny analysis was not applied in the most recent United States Supreme Court pronouncement on the subject, *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed,2d 532 (1975).

We think that language in *Shapiro* and *Maricopa County* and the ruling in *Sosna* indicate that a durational residency requirement does not automatically trigger strict scrutiny. To determine whether or not the stricter test is applicable, we must look at the factors which have been advanced in the Supreme court cases as explaining the different results. Our analysis of the cases reveals four possible "distinguishing factors," any one of which may invoke the strict scrutiny test.

First, *Sosna* distinguished the earlier cases on the basis that they had involved state justifications based only on administrative, budgetary, or recordkeeping needs.[21] To the extent that this distinction

does apply here, the justifications put forward by the state go beyond budgetary, recordkeeping, and administrative concerns, and thus, under this distinction, the case at bar falls into the *Sosna* non-strict scrutiny camp.

The second distinction is the one suggested in *Maricopa County*-the "basic necessities" distinction. If the benefit of which new residents are deprived by the state is a "basic necessity" of life--*e. g.*, the welfare payments in *Shapiro*, or the medical care in *Maricopa County*-then the strict scrutiny test is appropriate; otherwise, it is not.[22] Under this distinction, this case clearly falls into the non-strict scrutiny category, as a permanent fund earnings dividend is not a "basic necessity."

The third distinction is suggested by two passages in *Sosna* and by some language in *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973).[23] This distinction in-

**21.** What those cases [*Shapiro*, *Dunn*, and *Maricopa County*] had in common was that the durational residency requirements they struck down were justified on the basis of budgetary or recordkeeping considerations which were held insufficient to outweigh the constitutional claims of the individuals.

Iowa's residency requirement may reasonably be justified on grounds other than purely budgetary considerations or administrative convenience.

*Sosna v. Iowa*, 419 U.S. at 406, 95 S.Ct. at 560, 42 L.Ed.2d at 544–45.

**22.** Although any durational residence requirement imposed a potential cost on migration, the Court, in *Shapiro*, cautioned that some 'waiting-period[s] . . . may not be penalties.' . . . In *Shapiro*, the Court found denial of the basic 'necessities of life' to be a penalty.

Whatever the ultimate parameters of the *Shapiro* penalty analysis, it is at least clear that medical care is as much 'a basic necessity of life' to an indigent as welfare assistance. *Memorial Hosp. v. Maricopa County*, 415 U.S. at 258–59, 94 S.Ct. at 1082, 39 L.Ed.2d at 315 (citations and footnotes omitted).

**23.** *Sosna* distinguished *Shapiro*, *Dunn*, and *Maricopa County* partially on the ground that:
Iowa's divorce residency requirement is of a different stripe. Appellant was not irretrievably foreclosed from obtaining some part of what she sought, as was the case with the welfare recipients in *Shapiro*, the voters in *Dunn*, or the indigent patient in *Maricopa*

*County*. She would eventually qualify for the same sort of adjudication which she demanded virtually upon her arrival in the State. Iowa's requirement delayed her access to the courts but, by fulfilling it, a petitioner could ultimately obtain the same opportunity for adjudication which she asserts ought to be hers at an earlier point in time. 419 U.S. at 406, 95 S.Ct. at 560, 42 L.Ed.2d at 544. Similarly, the Court distinguished another due process case:
In *Boddie v. Connecticut*, [401 U.S. 371, [91 S.Ct. 780] 28 L.Ed.2d 113 (1971)] this Court held that Connecticut might not deny access to divorce courts to those persons who could not afford to pay the required fee. Because of the exclusive role played by the State in the termination of marriages, it was held that indigents could not be denied an opportunity to be heard 'absent a countervailing, state interest of overriding significance.' 401 U.S. at 377, [91 S.Ct. at 785] 28 L.Ed.2d at 113. But the gravamen of appellant Sosna's claim is not total deprivation, as in *Boddie*, but only delay. The operation of the filing fee in *Boddie* served to exclude forever a certain segment of the population from obtaining a divorce in the courts of Connecticut. No similar total deprivation is present in appellant's case, and the delay which attends the enforcement of the one–year durational residency requirement is, for the reasons previously stated, consistent with the provisions of the United States Constitution. 419 U.S. at 410, 95 S.Ct. at 562, 42 L.Ed.2d at 547.

dicates that there is a dispositive difference between a state absolutely denying a benefit and a state merely delaying provision of the benefit. Thus, a durational residency requirement of one year prior to eligibility to file a divorce action is permissible, since the right to file is merely delayed, not denied. This is a difficult distinction to apply in most cases, as any durational residency requirement can, it seems to us, be equally well characterized as either a "delay" or a "denial." The distinction becomes especially difficult when "denial" is interpreted to require that a party be "irretrievably foreclosed from obtaining *some part* of what the [the injured party seeks]," *Sosna*, 419 U.S. at 406, 95 S.Ct. at 560, 42 L.Ed.2d at 544 (emphasis added). Additionally, the fact that substantial hardship may be worked by the delay, a point raised by the dissent in *Sosna*, was apparently not regarded as significant by the majority.[24]

A close question is presented by the "delay" versus "denial" distinction, partly due to its inherent difficulty in application, and partly due to the nature of the program under scrutiny.[25] Although the result is not as clear as under the other two distinctions already considered, we still conclude that this case falls in the non–strict scrutiny camp.

Under the terms of the program, it is clear that there is no absolute denial. A new resident is immediately eligible for some portion of a dividend; and this new resident's achievement of the level of dividends currently held by a long–term resident who has been here since 1959 (twenty–one dividends, or a minimum of $1050) is only a matter of delay—*i. e.*, the new resident would have to remain a resident for twenty–one years. On the other hand, it could be said that the new resident will never achieve parity with the current long–

term resident, as the latter will always be twenty-one dividends ahead of the former if both remain in the state. Under this view, the new resident is consistently "denied" that twenty-one–dividend differential. Both characterizations of the program are accurate, and one could label the situation either a delay or a denial.

However, the significance of the latter characterization is considerably diluted by several factors. First, as the state points out, it is entirely possible that the new resident will "catch up" and even surpass the number of dividends granted to the long-term resident, depending on the longevity of each. Additionally, the size of each dividend will vary from year to year, and is expected to increase during the foreseeable future so that the attainment of twenty one dividends in the year 2001 is likely to be worth much more than the attainment of twenty–one dividends in 1980. Last, the new resident who arrives in 1980 and stays twenty–one years will not only get twenty–one dividends in 2001, but will have received a total of 210 dividends during the intervening years. In that respect also, the new resident may be better off, in that the twenty-one–year resident of 1980 receives twenty-one dividends in 1980, but no "back payments" for the 210 dividends he or she would have received had the program been established in 1959.

Taking these factors into account, we cannot say that a new resident can be properly characterized as being consistently denied parity with long–term residents. Although the delay/denial distinction is analytically difficult to apply in this context (indeed, one may question whether it has any applicability at all here), we are sufficiently satisfied that this is more properly classified as a delay than as a denial, and

---

**24.** *Sosna*, 419 U.S. at 421, 95 S.Ct. at 568, 42 L.Ed.2d at 554 (Marshall, J., dissenting): "[The majority's] analysis, however, ignores the severity of the deprivation suffered by the divorce petitioner who is forced to wait a year for relief."

**25.** As a matter of construction of Alaska's equal protection clause, the distinction between delay and denial has no application.

thus strict scrutiny analysis is not triggered here.[26]

The last possible distinction is suggested by the characterization of *Dunn* found in *Maricopa County* indicating that a state's denial of "fundamental rights"–e. g., voting rights–to new residents but not to old will invoke strict scrutiny.[27] This distinction perhaps renders the right–to–migrate aspect of the case unnecessary, as it would seem that the denial of the additional "fundamental right" would in and of itself be enough to trigger strict scrutiny, with or without the presence of the right to migrate.[28] But assuming, *arguendo*, the validity of the distinction, it seems clear that this case again falls into the *Sosna* non-strict scrutiny category. If the right involved in *Sosna* –that of filing a lawsuit for divorce–does not trigger strict scrutiny, then the denial of initial equality in the distribution of permanent fund earnings, at stake here, also fails to do so under this distinction.

Thus, whatever distinction is applied, this case falls outside the strict scrutiny standard. Under traditional federal equal protection analysis, this means that the case comes within the lower tier, to be assessed under the rational basis standard.[29] As such, we think it is clear that this statute withstands constitutional scrutiny. However, we postpone discussion of the state's purposes until our analysis under the *Erickson* test. It is not necessary for us to assess the state's purposes under the rational basis standard here. If the purposes and the relationship between means and ends satisfy the stricter *Erickson* test, then they *a fortiori* meet the requirements of the less strict rational basis test; and if the statute fails to pass muster under the state test, then it is invalid regardless of whether it passes federal constitutional muster.

### B. State Equal Protection Analysis Under *Erickson* [30]

■ Examination of the nature and extent of the infringement of the constitu-

---

**26.** We think it inappropriate to base resolution of this appeal on predictions of the state's oil and gas reserves. The statute by its terms is of indefinite duration. Our ability to assess the extent of the state's oil and gas reserves, and its other mineral reserves, is too limited, compared to that of the legislature which examined this situation in enacting the statute, to justify any other approach. The relationship between this mineral reserve factor and the longevity of the earnings distribution program is further attenuated by two factors: first, the cessation of mineral income flowing into the fund will affect only its growth, not its income–generating capacity; and second, any cessation of the distribution program itself would be a difficult political decision–i. e., the trade–off between the program and other governmental services will have to be assessed, which is the primary reason for the earnings distribution system's original enactment.

**27.** "In *Dunn v. Blumstein*, the Court found that the denial of the franchise, 'a fundamental political right,' was a penalty requiring application of the compelling–state–interest test." *Maricopa County*, 415 U.S. at 259, 94 S.Ct. at 1082, 39 L.Ed.2d at 315 (citations omitted).

**28.** *Dunn* itself ruled that strict scrutiny was triggered by either the benefit withheld by the classification (the opportunity to vote) or the basis for the classification (recent interstate travel). 405 U.S. at 335, 92 S.Ct. at 999, 31

L.Ed.2d at 280. *See also* Note, *A Strict Scrutiny of the Right to Travel*, 22 U.C.L.A.L.Rev. 1129, 1153 (1975), which stated:

> In examining 'fundamental right' penalty analysis, one is struck by its redundancy. If only the denial of a separate, fundamental right constitutes a penalty on the right to travel, one wonders why denial of that separate right is not in itself enough to trigger strict scrutiny.

**29.** There is a possibility that *Sosna* may have established an intermediate third tier involving some sort of balancing test. *See Sosna*, 419 U.S. at 419, 95 S.Ct. at 567, 42 L.Ed.2d at 552 (Marshall, J., dissenting). If this is the case, this third tier is substantially undefined at this point. We believe we are justified in treating this possibility as the equivalent of our own *Erickson* test, and thus there is no need to assess the "third tier" independently.

**30.** The *Erickson* approach is essentially one of balancing. On the one hand, the court must assess (1) the legitimacy of the state purpose purportedly furthered by the provision, and (2) the extent to which the relationship between the end (the asserted purpose) and the means (the classification chosen) is fair and substantial. On the other hand, the court is to determine the nature and the extent of the infringement of individual rights allegedly caused by the classification. Then the balance is struck.

tional right involved has led us to conclude that this legislative scheme cannot be said to "penalize" the right of interstate migration. In commonsense terms, it is easy to see that the imposition of a tax primarily on new residents, with older residents exempt, can be perceived as a penalty imposed on a person who chooses to exercise his or her right to move into Alaska.[31] It is much more difficult to perceive such a "penalty" here. The new resident does, in fact, receive financial gain for exercising his or her right to move into Alaska; and whatever "penalty" may accrue from the fact that this gain is not as large as that realized by a long-term resident we regard as *de minimis.*

■■■ In making this judgment, we are aware of the statements by the United States Supreme Court that a showing of "deterrence" is not necessary to a finding of an infringement upon the right to migrate; but it is also true that the Court has consistently relied upon the severity of the penalty inflicted upon the individual for exercising the right of interstate migration in reaching its results in various cases.[32] In our view the permanent fund earnings distribution statute can only be characterized as a penalty with great awkwardness. We are therefore convinced that the exercise of the right of interstate migration is not penalized by the statute in question.

Turning to the state's purported interests in establishing the system and the fairness and substantiality of the relationship between the ends (*i. e.,* the "purpose" or state interest) and the means (*i. e.,* the classification), we find three purposes listed in the statute itself:

(1) to provide a mechanism for equitable distribution to the people of Alaska of at least a portion of the state's energy wealth derived from the development and production of the natural resources belonging to them as Alaskans;

(2) to encourage persons to maintain their residence in Alaska and to reduce population turnover in the state; and

(3) to encourage increased awareness and involvement by the residents of the state in the management and expenditure of the Alaska permanent fund (art. IX, sec. 15, state constitution).

The state argues that the link between residency and number of dividends bears a fair and substantial relationship to the legitimate purpose of making an "equitable distribution," the first listed purpose. In so arguing, the state urges the court to recognize the "contributions of various kinds, both tangible and intangible," which residents have made during their years of state residency:

Many have paid taxes; many have contributed to the cultural life of the state and have fostered the cultural diversity that makes Alaska so unique; many have contributed their ideas and have participated in the political life of the state; all have endured the rigors of a harsh climate; and all have borne the impact of a high cost of living. It is perfectly reasonable for the legislature to have concluded that it would be unfair in distributing permanent fund income to fail to recognize those years of residence during which people have had and will have a share in the mineral resources—years during which residents have made and will make contributions to the state.

In response, the Zobels cite us to *Cole v. Housing Authority of the City of Newport,* 435 F.2d 807, 813 (1st Cir. 1970), in which Judge Coffin, although granting that giv-

---

**31.** *See Williams v. Zobel,* 619 P.2d 422, at 431–32 (Alaska 1980) (Rabinowitz, C. J., concurring).

**32.** L. Tribe, American Constitutional Law § 16–8 at 1004 (1978), states:
Yet although the Court [in *Memorial Hospital v. Maricopa County,* 415 U.S. 250, [94 S.Ct. 1076], 39 L.Ed.2d 306 (1974)] acknowledged

that a showing of *deterrence* from travelling by the challenged restriction was not only lacking but also unnecessary, the Court relied heavily on its conclusion that the *penalty* inflicted was very severe .... [footnotes omitted] [emphasis in original]

ing a preference to older residents may have a certain facial appeal, held that "such a vague sentiment, even if permissible, does not rise to the level of compelling state interest."

■ Although the question is a close one, we must hold that the purposes underlying this statute are legitimate under state law, and also that a fair and substantial relationship exists between those purposes and the classification made under the distribution scheme. Throughout its history, from the days of the Gold Rush to the recent oil pipeline period, Alaska has been prone to the phenomenon that large numbers of people from without the state move in, derive great financial and other benefits from the state's resources and opportunities, and then move out to enjoy the fruits of their labors elsewhere. This obviously results in a great drain of financial and other resources from the state.[33] Of course, every

33. D. Kresge, T. Morehouse and G. Rogers, Issues in Alaska Development 32–33 (1977) (footnotes omitted), state:

The nonresident nature of Alaska's economic activities was not limited to ownership and control of the means of production, but also included the labor force. Alaska's extreme seasonality (due to northern location, climatic conditions, fisheries, etc.), remoteness, lack of urban amenities, and high cost of living all favored the use of seasonally imported labor for much of the basic economic activities. Monthly data on employment covered by the Alaska unemployment compensation program for the period 1940–42 (the earliest of such data available) indicates that for all covered industries the low month of January was 59 percent of the annual average monthly employment and the high month of July, 148 percent (salmon canning ranged from a low of 16 percent of the annual monthly average to a high of 279 percent). Studies of labor in the Alaska canned salmon industry in 1939 and 1940 indicated that of all persons engaged in fishing, transporting, and processing within Alaska, 46 percent were resident Alaskans, 48 percent nonresidents and 6 percent were unallocated. Of the fish caught for the canneries, 43.6 percent were caught by residents and 56.4 percent by nonresidents (for the Western region–Alaska Peninsula and Bristol Bay–the fish catch was 34.6 percent by residents and 65.4 percent by nonresidents).

Because of this nonresident seasonal workforce, the balance of trade statistics for 1931–40 give only a partial view of the extent to which value of products from colonial Alaska escaped the local economies. The first attempts to calculate personal income received by residents of Alaska was made in the mid–1950's when much of the pre–World War II economy had disappeared, but the investigations of income generated by fishing and fish processing in 1954 give an indication. Of the total $78 million wholesale value of fisheries products, only $15 million or 19.2 percent represented earnings by residents.

Economics and labor requirements in turn determined colonial Alaska's social conditions. A 1937 look at Alaska generalized that 'the labor situation in the Territory is influenced by the fact that the population consists almost entirely of adult males, engaged for the most part in occupations requiring considerable physical activity and mobility, and living, to a very considerable extent, in rather scattered and often more or less temporary communities. This type of employment tends to discourage the building of normal family and communal life.' Census data document the male dominance (nine males to one female in 1900, five to one in 1909, three to one in 1920, and two to one in 1929 and 1939), that non–Natives overwhelmingly left Alaska before sixty–five years of age, and that the proportion of minors was abnormally low. To again quote the 1937 report, 'These circumstances again militate against the establishment of permanent communities with well–developed social activities.'

The problems noted in the 1937 report did not diminish with time:

Actually, throughout the years of the Second World War, the "cold war," and the Korean conflict, Alaska had received people from all parts of the United States and elsewhere. Many of these new Alaskans were intent upon getting what they could from federal defense spending, saving as much as they were able with the hope of leaving the Territory and investing or spending their hard–earned Alaskan savings in some part of the continental United States where one could obtain much more for the dollar than in the Northland.

C. Hully, Alaska Past and Present 372 (3d ed. 1970). These problems have continued to plague Alaska:

Responses from the 1970 census question, 'Where was this person five years ago?' reveal the significance of migration in Alaska. Net migration (persons entering minus persons leaving) comprised nearly one half of the population growth occurring between 1965 and 1970. However, that is only the tip of the iceberg. Approximately 120,000 individuals moved to Alaska between the years 1965 and 1970; yet, almost 100,000 Alaskans left the state over that same period. Thus for every six individuals who moved to Alaska, five individuals left the state.

state is equally subject to this phenomenon as a necessary by–product of the right of interstate migration; but Alaska is especially affected by this, due to its harsh climate, its high cost of living, and its geographical isolation from the other states. Although the problem is not unique to Alaska, the extent to which this problem affects the state is probably unparalleled.[34]

Since this problem is a necessary by–product of the free exercise of the right of interstate migration, neither Alaska nor any other state may attempt to ameliorate it by penalizing an individual for choosing to exercise the right to migrate. However, this does not preclude an attempt to reward those Alaskan residents who have chosen to stay, to enjoy the fruits of their labor here, and to make a lasting contribution, tangible or intangible, to the state's culture and commonwealth. Such an attempt does not penalize those who choose to leave any more than a firm's awarding of a gold watch to a fifty–year employee penalizes employees who leave before working for fifty years.

Thus, we find this purpose permissible. We need not take issue with Judge Coffin's statement in *Cole* that it does not rise to the level of a "compelling state interest," inasmuch as we have ruled that durational residency requirements do not, under *Erickson's* approach, automatically trigger strict scrutiny.[35]

In finding that the state may reward long–term residents for their past intangible contributions, we are guided by the analysis set forth in our opinions in the other half of this case, concerning former AS 43.20.017 (ch. 22, SLA 1980), the tax exemption statute. In that context, the

parties argued over the legitimacy of the state recognizing past tax contributions in granting tax relief. The plurality opinion found this purpose absolutely impermissible, under *Shapiro v. Thompson*, 394 U.S. 618, 632–33, 89 S.Ct. 1322, 1330, 22 L.Ed.2d 600, 614 (1969). *See Williams v. Zobel*, 619 P.2d 422, 428–29 (Alaska 1980). The concurrence rejected this absolutist position, *id.* at 434 (Rabinowitz, C. J., concurring), noting that it would be inconsistent with the Supreme Court's affirmance in *Starns v. Malkerson*, 326 F.Supp. 234 (D.Minn.1970), *aff'd without opinion*, 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971), *cited with approval, Vlandis v. Kline*, 412 U.S. 441, 452 n.9, 93 S.Ct. 2230, 2237 n.9, 37 L.Ed.2d 63, 72 n.9 (1973), in which the district court specifically relied upon a past tax contributions rationale. We also note that the absolutist position is undercut by the Supreme Court's opinion in *Reeves, Inc. v. Stake*, —— U.S. ——, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980), which upheld South Dakota's policy of selling cement from its state–owned plant only to state residents, against a commerce clause attack. The Supreme Court stated, "The State's refusal to sell to buyers other than South Dakotans is 'protectionist' only in the sense that it limits benefits generated by a state program to *those who fund the state treasury* and whom the State was created to serve." —— U.S. at ——, 100 S.Ct. at 2280, 65 L.Ed.2d at 254 (emphasis added). We think that this analysis is persuasive in concluding that rewarding past intangible contributions is also a permissible purpose, albeit not a particularly compelling one.

The Zobels argue, and the superior court found, that even if the purpose is permissi-

---

Alaska population growth throughout the 1960's was moderate when compared to the oil spurred growth of the 1970's. It is likely that in–, out–, and net–migration rates from the 1970 census will pale by comparison with the results of the upcoming 1980 census. Alaska Dept. of Labor, Alaska Population Overview 30–31 (1979) (footnotes omitted).

**34.** In making this analysis, we do not mean to indicate that Alaska is to be allowed greater leeway in this area than other states. We think

any state could validly pursue similar techniques to reward long–term residents. The point is that most other states have much less need to do so than Alaska, since the problem is much less acute.

**35.** This does not necessarily mean that all classifications based on this purpose will be upheld; a classification may very well be inappropriate if it results in a penalty being placed on the exercise of the right of interstate migration.

ble, there is no fair and substantial relationship between recognizing past contributions and the classification based on length of residency:

> [T]he state admits that, in order to qualify for a share in the resources trust, it is not even necessary that a person have made any contribution to the state at all. All that is required is that a person be a resident.

Although we recognize that length of residency may be an imperfect measure of past contributions, we have concluded that the state may recognize these contributions. The fit between means and ends need not be perfect. We think the relationship is fair and substantial. There clearly is a correlation between one's length of residency and the extent to which that individual has been able to make contributions to the community. We are not convinced that any workable alternative method of measuring past contributions is clearly preferable. Although the existence of a preferable alternative would not automatically render the relationship unfair or insubstantial, the ab-sence of any preferable workable alternative is a strong indication that the classification chosen by the legislature is acceptable. We think that the relationship is as fair and substantial as the Alaska Constitution requires in this context.

The second of the listed purposes is clearly related to the classification system. A significant financial incentive is created to encourage persons to establish and maintain residency in Alaska; and the stabilization of long–term residents clearly reduces population turnover. The Zobels do not argue that this is an impermissible purpose,[36] but rather that it does not rise to the level of "compelling." They argue that the state enjoys wide latitude in possible approaches to the population turnover problem, but that penalizing new residents for having recently exercised the fundamental right to migrate is not among them. As above, we do not regard this system as imposing a "penalty" on new residents. Thus, we hold this purpose to be permissible and the relationship clear, as these points seem uncontested.[37]

**36.** It could be argued that the financial incentive to remain is an attempt to discourage long–term residents from exercising their right of interstate migration, and that, if all the states were to enact such a program, this effect would be significant. We do not regard this argument as relevant here, for several reasons. First, the Zobels do not argue that this factor is pertinent to their own decision as to whether or not to exercise their right of interstate migration. Second, even if they did so, there would be a serious standing problem, as they are not in the position of a long–term Alaska resident facing a loss of permanent fund benefits by leaving the state. Third, the loss in such a situation would stem from the statute's simple residency requirement, AS 43.23.010(b)(2), not its durational residency link, and thus would be subject to a different mode of analysis.

Even assuming that we ignored all previous objections, there is authority to reject the argument on its merits. In *Fisher v. Reiser*, 610 F.2d 629 (9th Cir. 1979), the court upheld a Nevada law which, although paying workers' compensation benefits to eligible beneficiaries whether they lived inside or outside the state, included a cost–of–living increase limited to those recipients living in the state. The Ninth Circuit held that the decrease in benefits visited upon a recipient migrating out of the state did not burden the right to travel in a manner requiring strict scrutiny:

> For some kinds of monetary benefit programs for which a residency requirement would be constitutional, a state is not required to, and may not in fact, provide any program at all. Losing such benefits upon migration from a state which does provide them does not thereby mean the right to travel has been infringed.

*Id.* at 635. *See also Califano v. Torres*, 435 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978).

**37.** We note that the relationship between the classification and purposes (2) and (3)–to encourage long–term residency and increased awareness of the management of the fund–is somewhat diluted by the fact that the term of residency is counted, not from 1980, but from 1959. However, we do not find that this changes the outcome of the balance, for several reasons.

First, the selection of the year from which residency will be counted is not a significant aspect of the statute. The state points out that, were residency counted from 1980, a new resident migrating to the state in 2001 would be in the same situation as appellees are now; if the statute would be constitutional with residency counted from 1980 as to residents migrating into Alaska in 2001, it is constitutional as to the Zobels here with residency counted form 1959.

Second, we think that purpose (1)–expressing the state's appreciation for the tangible and

The third justification proffered is, perhaps, the most interesting: that the distribution scheme "encourages increased awareness and involvement by the residents of the state in the management and expenditure of the Alaska permanent fund."

The state puts forward two related purposes which revolve around "prudent management" of state resources. First, this classification system installs a greater motivation for the public to urge "prudent management" of the fund itself. Were the distribution made per capita, the state argues,

as population increases, each individual share in the income stream is diluted. The income must be divided equally among increasingly larger numbers of people. If residents believed that twenty years from now they would be required to share permanent fund income on a per capita basis with the large population that Alaska will no doubt have by then, the temptation would be great to urge the legislature to provide immediately for the highest possible percentage return on the investments of the permanent fund principal, which would require investments in riskier ventures . . . .

Under AS 43.23, each resident will receive an increasing number of dividends the longer he or she resides in the state. Each person's share will have increased substantially after twenty years, instead of having been diluted as it would have been under a per capita distribution system. Under AS 43.23, all generations of residents, not only today's residents but future residents as well, will therefore have an interest in insuring that the payment fund is managed prudently so that a healthy income stream will be available twenty, thirty, and forty years after they have begun to accumulate their individual dividends.

A similar point is raised by the state in regard to prudent management of the state's natural resources. A per capita distribution is more likely to encourage the public to press for immediate and rapid development of the state's mineral resources, as each set of dividend recipients would want to see as much revenue as possible flowing immediately into the fund. Allowing benefits to increase with residency installs a counterbalance to this motiva-

intangible contributions of its long–term residents–does justify the selection of the 1959 date. Statehood was the point at which this state first became entitled to the resources which have yielded the income currently being distributed. Also, the state's low population and sudden assumption of statehood responsibilities in 1959 made the next few years difficult for the state and its residents:

A government such as the one embodied in the Alaska constitution, however, with its complete range of governmental services, was expensive for a State with limited sources of taxation. Alaska could only boast of a couple of pulp mills. There were a few producing oil and gas wells, possibilities of hydroelectric power development, the likelihood of diversification in the fishing industry, some mining, and prospects for a vastly increased tourist trade. The State's business enterprises were small and catered mostly to local needs. In addition, Alaska's population was modest and hardly amounted to more than that of a medium–sized city in the continental United States.

Accordingly, revenues were small. Yet, the demands were great. The State government had to provide all the governmental services and social overhead required by

modern American society. For instance, it would have been relatively simple to build a few roads, furnish normal police protection, and establish the customary school facilities. But nothing was normal in Alaska; it was and remains a land of superlatives. Subarctic engineering is relatively new, but the State would have to face the problem of permafrost conditions that frequently cause the roadtop to buckle and heave. Police protection would have to be provided for an area one–fifth the size of the forty–eight United States but with very few roads available. Flying would become a way of life for law enforcement officials as well as other Alaskans–an expensive way of life. 'Bush schools' scattered along the Aleutian chain, through the Yukon Valley, and on the Seward Peninsula and the islands of southeastern Alaska were expensive to maintain. It was not until the discovery of oil on a large scale that the picture changed.

C.–M. Naske, An Interpretive History of Alaskan Statehood 169–70 (1973).

Given that the state's first years were its leanest, during which its few residents tolerated the heavy burdens of implementing the new state government, we believe that selection of the 1959 date is justifiable.

tion, in that each year's recipients may stand to gain more by slowing development somewhat and increasing the size of the dividend in subsequent years, when those residents will presumably be getting an additional dividend for their additional year of residency.

The superior court and the Zobels seem to have misunderstood this point. The superior court apparently interpreted the argument as meaning that granting full benefits to the newcomers would result in the newcomers putting pressure on the legislature.[38] This is the same misconception that is reflected in the Zobels' response:

> The idea that if new residents are treated fairly, they will just get greedy and try to drain the fund is without basis in logic or fact. It has no basis in the record and represents little more than a gratuitous insult to everyone who has not been here since 1959.

This fundamentally misconstrues the argument the state makes. All recipients, not just long–term or short–term residents, would be subject to these incentives and motivations.

We think that installing this "counterbalance" incentive system is a permissible goal, and that the classification system is fairly and substantially related to it.

Having assessed the factors on both sides of the *Erickson* scale, the balance must be struck. The guidance which can be gleaned on this point from prior case law is limited. This distribution scheme, and indeed the permanent fund itself, are novel solutions to an unusual problem created by several relatively recent political concerns. The convergence of these concerns–administering and husbanding Alaska's new–found wealth, avoiding the "cost–free" expansion of government, coping with an acute population turnover problem, and containing and

counterbalancing the push for immediate development of Alaska's resources–has been dealt with legislatively by enacting a relatively simple, but unusual distribution scheme. Unlike the tax exemption statute, this program has little or no precedent in American political thought.

If the privileges and immunities cases indicated that a distinction drawn between residents and nonresidents would be impermissible for a benefit distribution plan like this one, we would have an *a fortiori* argument that such a classification based on term of residency would be impermissible.[39] However, our reading of the applicable law leads us to conclude that a state would be justified in drawing a distinction between residents and nonresidents in distributing the permanent fund earnings dividends.[40] See *Baldwin v. Fish & Game Commission of Montana*, 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978); cf. *Califano v. Torres*, 435 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978); *Starns v. Malkerson*, 326 F.Supp. 234 (D.Minn.1970), aff'd without opinion, 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971). This does not make the distinction drawn here automatically permissible; it merely means that simple residency requirement cases do not provide clear guidance.

The case law does inform us that since "we deal here with a constitutional attack upon a law providing for governmental payments of monetary benefits [, s]uch a statute 'is entitled to a strong presumption of constitutionality.'" *Califano v. Torres*, 435 U.S. 1, 5, 98 S.Ct. 906, 908, 55 L.Ed.2d 65, 69 (1978), quoting *Mathews v. De Castro*, 429 U.S. 181, 185, 97 S.Ct. 431, 434, 50 L.Ed.2d 389, 394 (1976); see also *Fisher v. Reiser*, 610 F.2d 629 (9th Cir. 1979).

Beyond that general principle, the case law is less helpful here than in the balanc-

---

**38.** The superior court said, "This argument, however, is insufficient under any standard of review to sustain a distinction based on length of residency. What is there to prevent those who would receive maximum benefits under this statute from making similar demands on the legislature?"

**39.** See *Williams v. Zobel*, 619 P.2d 422, 435–37 (Alaska 1980) (Rabinowitz, C. J., concurring).

**40.** Were the permanent fund earnings distribution payments tied to "basic necessities," the rule of *Shapiro v. Thompson* would apply; but such is not the case.

ing of the tax exemption scheme.[41] Given that this distribution system works no infringement on the exercise of the right of interstate migration, the purposes put forward by the state need not be as strong as would be required if the provision penalized the exercise of that right. On that basis, coupled with our conclusions that the purposes put forward by the state are legitimate and sufficiently weighty, and that the classification system has a fair and substantial relationship to these purposes, we conclude that the permanent fund income distribution statute is constitutional.[42]

Thus, for the foregoing reasons we conclude that the permanent fund income distribution statute is valid under both the Alaska and United States Constitutions.

The judgment of the superior court as it pertains to the constitutionality of the permanent fund statute is therefore Reversed.

BOOCHEVER, J., not participating.

BURKE, Justice, concurring.

I have serious reservations about certain aspects of the permanent fund dividend distribution plan, AS 43.23. Among these, it appears questionable to me whether the plan satisfies the "public purpose" requirement of article IX, section 6, of the state constitution.[1] That section provides, in part: "No . . . appropriation of public mon-

ey [shall be] made . . . except for a public purpose." I think a strong argument can be made that the plan is one that amounts to "the giving away of public assets without any corresponding discernible benefit,"[2] and that it, therefore, should be struck down. *Compare Wright v. City of Palmer,* 468 P.2d 326, 330–31 (Alaska 1970); *Walker v. Alaska State Mortgage Assoc.,* 416 P.2d 245, 251–53 (Alaska 1966); *Suber v. Alaska State Bond Committee,* 414 P.2d 546, 551–52 (Alaska 1966); *Lien v. City of Ketchikan,* 383 P.2d 721, 722 (Alaska 1963); *De Armond v. Alaska State Development Corp.,* 376 P.2d 717, 721–22 (Alaska 1962). This aspect of the plan has been largely ignored, both by the parties and my colleagues at the bench.

I am persuaded, nevertheless, to concur in the conclusion that the plan should be upheld.

The role of the courts in matters of this kind is relatively limited. Our function is not to determine whether, as prudent burghers, we might think this plan wise. [Citation omitted.] The test that we must apply is whether the plan is so unreasonable as to transgress the limitations of our constitution.

*Wright v. City of Palmer,* 468 P.2d at 331. We "will not set aside the finding of the

---

41. Were we continuing to adhere to the boarder language in the pre–*Erickson* opinions dealing with the right of interstate migration, they might well be dispositive; but we have elected not to apply the strict scrutiny analysis.

42. The dissent points out possible infirmities of the statute as applied to minors. We think it unnecessary to address those issues at this point. The Zobels have not complained concerning that aspect of the statute, and would have no standing to do so. The parties have not briefed the issue. The mode of analysis would be substantially different than that applied to right–to–migrate cases. Therefore, we think it best to defer comment on this aspect of the statute until the question is presented in an adversarial context.

1. I am troubled too by the plan's treatment of residents under the age of eighteen years. It clearly recognizes that such persons have an equitable interest in the plan, since at age eighteen they are entitled to claim one dividend for

each prior year of residency. The problem is that during those prior years, unlike persons eighteen and over, they will receive no direct financial benefit *solely because of their age.*

Traditionally, of course, we have treated children as a separate class. Under various rationales we have denied children many things that could not be denied their elders without violating the latter's constitutional rights. One good example would be the right to vote. Whether one or more of these rationales would support the difference in treatment seen in Alaska's permanent fund dividend distribution plan is at least open to serious question.

This issue, however, is not squarely before us. Thus, it need not be decided. I mention it only because I find it troublesome and, perhaps, worthy of consideration by the legislature or other interested parties.

2. *Wright v. City of Palmer,* 468 P.2d 326, 331 (Alaska 1970).

legislature [that a public purpose will be served] unless it clearly appears that such finding is arbitrary and without any reasonable basis in fact." *De Armond v. Alaska State Development Corp.*, 376 P.2d at 721. Since I cannot say that such is the case here,[3] I concur in the opinion of the Chief Justice.

DIMOND, Senior Justice, joined by MATTHEWS, Justice, dissenting.

I dissent from the majority's holding that the permanent fund dividend program, AS 43.20.010–.100 (Ch. 21, SLA 1980) is constitutional. I do so on the grounds that, under the equal protection clauses of the United States and Alaska Constitutions, first, the state may not impose an unlimited durational residency requirement, and second, the state may not award dividends in the interest derived from the permanent fund retrospectively back to statehood.[1]

I

When the only difference separating the $1,050.00 that one resident will receive this year from the $50.00 received by another is twenty years of residency in the state, I do not believe that the present distribution system can be characterized as imposing anything other than a lengthy, and in fact, an open–ended, durational residency requirement. I believe this violates the equal protection clauses of both the United States and the Alaska Constitutions. This is so even though the benefit involved here may not be as important as some of the other rights or benefits conditioned on periods of residency that have been considered in past decisions.

A statute imposes a durational residency requirement when it creates distinctions between residents on the basis of their length of residency.[2] Ordinarily, durational residency requirements create two classes of

3. The legislature's enactment of the permanent fund dividend distribution plan, AS 43.23, was preceded by the following statement:

> Section 1. POLICY, PURPOSES AND FINDINGS. (a) It is the duty and policy of the state with respect to the natural resources belonging to it and the income derived from those natural resources to provide for their use, development, and conservation for the maximum benefit of the people of the state.
> (b) The purposes of this Act are
> (1) to provide a mechanism for equitable distribution to the people of Alaska of at least a portion of the state's energy wealth derived from the development and production of the natural resources belonging to them as Alaskans;
> (2) to encourage persons to maintain their residence in Alaska and to reduce population turnover in the state; and
> (3) to encourage increased awareness and involvement by the residents of the state in the management and expenditure of the Alaska permanent fund (art. IX, sec. 15, state constitution).
> (c) The legislature finds that the accrual of permanent fund dividends provided in AS 43.23 enacted in sec. 2 of this Act, based on full years of residency since January 1, 1959, fairly compensates each state resident for his equitable ownership of the state's natural resources since the date of statehood. It is in the public interest to distribute a portion of Alaska's energy wealth to the people of the state.

> (d) The legislature also finds that state residents have been paying increasingly high prices for fossil fuels, while few have received direct monetary benefits from the production and development of fossil fuels belonging to them as Alaskans. It is in the public interest to return to state residents a portion of the state's income from oil, gas, and other mineral production to help offset rising fuel costs.
> (e) The legislature also finds that there exists in the state a serious problem of population turnover. A substantial portion of the state's population is comprised of individuals who reside in Alaska for only a relatively short time. This constant turnover in population leads to political, economic, and social instability and is harmful to the state. It is in the public interest for the state to promote a stable resident population by providing an incentive to encourage Alaskans to maintain their residency in the state.
> Ch. 21, § 1, SLA 1980.

1. While this statutory scheme is not retroactive because it is effective beginning only this year, rather than as of 1959, I believe the scheme is retrospective in the sense that it requires looking to the past to determine the number of dividends each resident will receive—one for each year of residency in Alaska since 1959.

2. *See Dunn v. Blumstein*, 405 U.S. 330, 334–35, 92 S.Ct. 995, 999, 31 L.Ed.2d 274, 279–80 (1972); *Shapiro v. Thompson*, 394 U.S. 618, 627, 89 S.Ct. 1322, 1327, 22 L.Ed.2d 600, 611 (1969).

residents. One class receives a particular benefit because its members have resided in the state for more than a specified period of time, while the other class is denied the same benefit because its members have not resided in the state for the specified period of time. The statute in question in this case does not create the usual durational residency requirement. All residents of Alaska over eighteen years of age are immediately eligible to share in the income from the permanent fund. However, by the terms of this statute, the number of years a person has been a resident of Alaska determines how large his or her share will be each year in the income from the fund. Thus, the statute specifically creates distinctions between residents based upon the duration of their residency in Alaska.[3] A statute creating such distinctions can only be identified as one which imposes a durational residency requirement.

The decisions of the United States Supreme Court dealing with durational residency requirements establish that such requirements are constitutionally permissible in certain cases, either as an element of proof that one is a bona fide resident, *Vlandis v. Kline*, 412 U.S. 441, 453, 93 S.Ct. 2230, 2237, 37 L.Ed.2d 63, 72 (1973), or for other legitimate state interests, *Sosna v. Iowa*, 419 U.S. 393, 406, 95 S.Ct. 553, 560, 42 L.Ed.2d 532, 544 (1975). But it has never been questioned that durational residency requirements, when valid, must be reasonable in length. Thus, Mr. Justice Stewart, writing for the Court in *Vlandis*, stated, "Nor should our decision be construed to deny a State the right to impose on a student, as one element in demonstrating bona fide residence, a *reasonable* durational residency requirement, which can be met while in student status." 412 U.S. at 452, 93 S.Ct.

at 2236, 37 L.Ed.2d at 72 (footnote omitted) (emphasis added). When durational residency requirements have been struck down, the dissenters who would permit the requirements have usually been careful to note their views that such requirements must be reasonable in length. Chief Justice Warren, joined by Justice Black, dissenting in *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), three times noted his view that Congress could authorize the states to impose "*minimal* residence requirements." 394 U.S. at 644, 646, 648, 89 S.Ct. at 1336, 1337, 1338, 22 L.Ed.2d at 621, 622, 623 (emphasis added). In the same case, Mr. Justice Harlan in dissent stated:

> Nor do I believe that the period of residence required in these cases—one year—is so excessively long as to justify a finding of unconstitutionality on that score.

394 U.S. at 677, 89 S.Ct. at 1354, 22 L.Ed.2d at 640. Similarly, Chief Justice Burger, dissenting in *Dunn v. Blumstein*, 405 U.S. 330, 363, 92 S.Ct. 995, 1013, 31 L.Ed.2d 274, 296 (1972), expressed his view that a "*reasonable* period" (emphasis added) could be imposed on newcomers before granting them their voting franchise.

In my view, the underlying premise of the United States Supreme Court in these cases is that while durational residency requirements may be imposed for legitimate purposes, once the durational requirement is fulfilled, it is not permissible beyond that point for a state to allocate its resources or benefits on the basis of length of residency. If such treatment were permissible the requirement that durational residency periods be reasonable and limited in scope would lose most of its meaning. Thus, the state could impose a limited durational residency requirement, such that all persons must be

---

**3.** This is illustrated by the following example: X is a twenty–five year old resident of Alaska who moved to the state one year ago. Y is a twenty–five year old life–long resident of Alaska. X and Y are both residents of Alaska but when permanent fund benefits are calculated, X will receive one dividend while Y will receive twenty–one. X will never catch up to Y because she has exercised her fundamental right to travel, nor will X's benefits ever be equal to

those of Z, a twenty–five year old, ten–year resident of the state for the sole reason that X exercised her fundamental right at a later point in time than did Z. Because these classifications act to penalize those residents who have recently exercised their right to travel by denying them benefits equal to those received by longer term residents they are, in effect, durational residency requirements.

residents of Alaska for some reasonable time period before they may share in the dividend program. However, I believe that once this requirement is fulfilled, all residents must be treated equally; that is, all residents must receive the same payments under the dividend program.

## II

The majority apparently agrees with the state's contention that the present disparities in payments[4] caused by awarding dividends from the permanent fund's income on the basis of years of residency are justified. This is so because, the state says, "Oldtimers will die or move away and today's new residents will become tomorrow's oldtimers," and "[i]t is the difference between looking at two residents in a still photograph or looking at them along with all other residents as participants in a motion picture."

I do not regard this argument as valid. It is logically impossible to test the effects of a program which differentiates between people based solely on their length of residence without using the same future period of residence for all people in the sample. Thus we can make sense of an hypothetical case involving two forty–year old Alaskans one of whom has lived here twenty years and the other ten years, who will both die after living here for another ten years.[5] However, if we alter the case and assume that the second person will live here for thirty years then the two people have not been, by definition, similarly situated and there is no reason to expect them to have received, in the aggregate, equal funds.

The state's argument is no different than arguing that a new resident who is not eligible for welfare because he does not meet a one year residency requirement is not treated differently from a one year resident who receives welfare because the former may remain in the state longer than the latter. This argument, of course, has been rejected by *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), and deserves no better treatment here.

Moreover, not only is the argument logically wrong, it is based on assumptions which are contradicted by the state's current projections. The majority suggests that a new resident who stays in the state until the year 2001 will be better off than today's long term resident. I do not think that this is a realistic assumption, and certainly it is not one that is supported by existing data.

Alaska is now in a position where it will earn, for at least the next ten years, an unprecedented surplus of funds from oil and gas taxes and royalties. Projections show, though, that after a peak in earnings around 1990, revenue will drop off as Prudhoe Bay the state's main source of revenue is depleted.[6] Meanwhile, population growth is expected to continue steadily.[7] The implication of these projections is that government spending will need to expand to provide services for a growing population at a time when the sources of revenue needed to fund these programs will be decreasing.[8] Future legislatures, which as the

---

4. The disparity in payments between old and new residents will grow larger in the near future because the size of the dividend payment is predicted to increase. Gross dividends for 1980 and 1981 are estimated to be $130 million. The Alaska Department of Revenue has estimated that gross dividends will grow to $479 million by 1986. Alaska Economic Information and Reporting System, Quarterly Report at 12 (July 1980).

5. In this case the first always will receive substantially more money than the second over the ten year period ($5,000 at current rates) or any other period one may care to posit.

6. *See* Alaska Dep't of Revenue, Petroleum Revenue Div., Petroleum Production Revenue Forecast Quarterly Report 1–2 (June 1980).

7. *See* Alaska Dep't of Labor, Alaska Population Overview 11 (1979).

8. The majority impliedly recognizes the truth of these projections. Thus, they say,

Alaska's oil and mineral wealth is based on nonrenewable resources which will become depleted at some point in the future, potentially leaving Alaska with the choice of either terminating certain governmental programs

state conceded are not bound to continue the dividend program, are likely to find that it will be impossible to pay dividends because all the interest from the permanent fund will be required to pay the costs of general government.

It is thus possible to surmise that the next few years will be the key period for participation in the dividend program. During this period dividend payments will be made at a time when the state will have enough of a budget surplus that use of permanent fund interest to fund state government will not be necessary, while the population receiving dividends will still be relatively small.

But the award of dividend payments for each year of residency since Alaska became a state in 1959 does not contemplate only one payment this year of accumulated dividends. What the statute provides for is the continued accumulation of dividends for each year in the future. Thus, one who has now been a state resident since 1959 will receive this year twenty–one dividends, or $1,050.00.[9] Next year, he or she will receive twenty–two dividends, the succeeding year, twenty–three dividends, and so forth. It follows from this that long–term residents of the state are likely to receive most of the benefits under the program.

By the time today's newly born or arrived residents have accumulated an equal number of dividends in the income from the permanent fund, the program may not exist in anything close to its present form. Besides probably receiving less money from the dividends, it is also likely that these residents will have to begin paying income taxes.[10] I do not mean to intimate that such a pessimistic forecast is certain to occur. But at the same time I think it is unrealistic to believe that the dividend program's continued viability in future years

can serve as a justification for a disparity in payments today.

The majority seems to place some reliance on language in *Sosna v. Iowa*, 419 U.S. 393, 406, 95 S.Ct. 553, 560, 42 L.Ed.2d 532, 544 (1975), in which the United States Supreme Court suggested that denying a divorce to a new resident for a year would be permissible because it would not permanently deprive anyone of a right but would only delay its availability. Aside from the fact that a year prior to *Sosna* we rejected *Sosna's* holding in *State v. Adams*, 522 P.2d 1125, 1132 (Alaska 1974), the delay involved in *Sosna* was only one year. In *Sosna* it was at least likely that new residents would achieve equality.

I do not believe that *Sosna's* logic can be extended to uphold a law that denies equal protection on the theory that the same benefit might be available as long as twenty years from now, since such a theory simply rests on speculation. I believe that the dividend distribution program must be examined from the perspective of what is in fact happening now, not from the perspective of the hopes and expectations the program might generate about the future. This is especially true of a program that depends, in large part, upon a finite, nonrenewable resource.

Assuming that strict scrutiny equal protection analysis is not appropriate when reviewing disparities in the award of a dividend payment, the balancing test in *State v. Erickson*, 574 P.2d 1 (1978), still requires that legislative classifications

> must be reasonable, not arbitrary, and must rest upon some difference having a fair and substantial relationship to the object of the legislation . . . .

*Id.* at 11, *quoting Isakson v. Rickey*, 550 P.2d 359, 362 (Alaska 1976) (emphasis omitted). Equal treatment of all Alaskans is

---

or continuing them through increases in taxation. 619 P.2d at 453 (Alaska 1980).

**9.** The value of a dividend this year has been set at $50.00. Dividends are predicted to increase

in value for a number of years in the future. *See* note 4 *supra*.

**10.** The Alaska state income tax statute was repealed by the legislature at a special session in September, 1980.

the norm, not the exception, required by our constitution.[11]

The statute offers three reasons justifying the present distribution system:

■ ... to encourage persons to maintain their residence in Alaska and to reduce population turnover in the state;

■ ... to encourage increased awareness and involvement by the residents of the state in the management and expenditure of the Alaska permanent fund (art. IX, sec. 15, state constitution); [and]

■ ... to provide a mechanism for equitable distribution to the people of Alaska of at least a portion of the state's energy wealth derived from the development and production of the natural resources belonging to them as Alaskans.[12]

I cannot conclude that the reasons advanced by the legislature justify a retrospective distribution of state benefits.

First, as to the need to create an incentive to reduce population turnover, the state has argued at some length that the money received from the dividends is too small in the beginning years of the program to attract new residents. If true, then the reverse seems to follow: the money involved is too small in the initial years to be of any real significance in making a deci-

sion to stay in the state. Consequently, I do not believe it can be argued that for newer residents of the state the program will have the effect of reducing population turnover. And as to long–term residents–principally those who have resided in Alaska since 1959–it is not at all unlikely that they had already committed themselves to remain in Alaska prior to the 1980 legislative enactment we are considering here. Thus, the need to create an incentive to reduce population turnover, specified as one of the purposes of the statute, does not really apply to long–term residents. By virtue of their length of residence in Alaska, it would appear unnecessary to give them the extra incentive to remain in the state by giving them the dividends from earnings of the permanent fund.

I can understand why in some circumstances the state might desire to reduce turnover within a particular group of the population.[13] But I cannot understand why all longer term residents should now be given this extra incentive to remain in the state when newer residents are not. I agree with the majority that the unstable nature of Alaska's population has created serious problems, but it seems obvious that the same problems are present regardless of

---

11. Article I, section 1, of the Alaska Constitution states:

*Inherent Rights.* This constitution is dedicated to the principles that all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry; that all persons are equal and entitled to equal rights, opportunities and protection under the law; and that all persons have corresponding obligations to the people and to the State.

Additionally, article VIII, section 17, provides specifically with regard to disposition of the state's natural resources:

*Uniform Application.* Laws and regulations governing the use or disposal of natural resources shall apply equally to all persons similarly situated with reference to the subject matter and purpose to be served by the law or regulation.

Section 2 of this article requires the state to manage its natural resources "for the maximum benefit of its people." This is not the same thing as management for the maximum benefit of long–term residents. *See Hicklin v. Orbeck,* 565 P.2d 159 (Alaska 1977).

12. Ch. 21, § 1, SLA 1980. These sections are not in the order in which they appear in the statute's statement of purposes.

13. For example, free admission to pioneer homes, AS 47.25.020-.030, and a state longevity bonus, AS 47.45.010, both require lengthy residency periods. Both those programs, however, are apparently designed to help those individuals who would like to retire in the state but cannot do so because of the high cost of living. The state might well want to limit these benefits to those that would suffer the most hardship by being forced to leave, and it seems reasonable to suppose that a long period of residency would be some indicia of close ties to Alaska and the disruption that leaving might cause. AS 14.40.763 and AS 14.40.825 provide for forgiveness of student loans based on years worked in the state. In a state with a shortage of skilled manpower it seems reasonable to attract students to return to the state upon graduation to practice their profession.

which segment of the population is "turning over." Reducing population turnover can best be accomplished by giving all bona fide residents [14] an equal share in the income from the permanent fund. This objective cannot justify the present unequal distribution system.

As to the second purpose, that Alaskans should be interested in the manner in which the government manages the permanent fund, it seems reasonable to assume that those with the greatest interest in its management will be those receiving the most money from it. But I cannot understand why one group of residents should be given an incentive to be more interested than another. I believe that the awareness and involvement of all Alaskans in the management of the permanent fund could be encouraged most by giving all bona fide residents [15] an equal share of dividend payments. I do not believe this avowed purpose can justify awarding different numbers of dividend payments on the basis of length of residency.

Finally, the program is supposed to accomplish an equitable distribution of the income from the permanent fund. The state's principal contention in this regard is that it is equitable to reward past residency to the exclusion of any other consideration because length of residency approximates the contributions an individual has made to the state. I do not believe that a "past contributions" rationale can support the present distribution of benefits on either constitutional or equitable grounds.

The United States Supreme Court has twice indicated that a state may not allocate services or resources to its residents based on a past tax contributions rationale. Thus, in *Shapiro*, the Court stated:

> Appellants argue further that the challenged classification may be sustained as an attempt to distinguish between new

and old residents on the basis of the contribution they have made to the community through the payment of taxes.... Appellants' reasoning would logically permit the State to bar new residents from schools, parks, and libraries or deprive them of police and fire protection. Indeed it would permit the State to apportion all benefits and services according to the past tax contributions of its citizens. The Equal Protection Clause prohibits such an apportionment of state services.

394 U.S. at 632–33, 89 S.Ct. at 1330, 22 L.Ed.2d at 614. The last quoted statement was footnoted, and in the footnote the Court recognized an exception, stating:

> We are not dealing here with state insurance programs which may legitimately tie the amount of benefits to the individual's contributions.

394 U.S. at 633 n.10, 89 S.Ct. at 1330 n.10, 22 L.Ed.2d at 614 n.10. In view of the very limited scope of the footnoted exception, I do not think that a narrow construction of the language preceding the footnote is warranted.

In *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), the Court had before it a Connecticut statute denying lower residency tuition rates to college students who were nonresidents when they applied to the state university but who became residents while attending the university. The Court struck down the statute while indicating that a reasonable durational residency requirement could be imposed on a student "as one element in demonstrating bona fide residence." 412 U.S. at 452, 93 S.Ct. at 2236, 37 L.Ed.2d at 72. However, the Court expressed grave doubts as to whether Connecticut could impose a tuition scheme charging less to old residents than to new (assuming bona fide residence

---

**14.** I believe a statute could require a reasonable period of residence in a state to establish the newcomer's bona fide residency before permitting the person to share in the dividend payments. *See Vlandis v. Kline*, 412 U.S. 441, 452, 93 S.Ct. 2230, 2236, 37 L.Ed.2d 63, 72 (1973), where it is stated:

> Nor should our decision be construed to deny a State the right to impose on a [person] as one element in demonstrating bona fide residence, a reasonable durational residency requirement ....

**15.** *See* note 14 *supra*.

in both cases) in recognition of the fact that the old residents had contributed more to the state. The Court stated:

> But even if we accepted the State's argument that its statutory scheme operates to apportion tuition rates on the basis of old and new residency, that justification itself would give rise to grave problems under the Equal Protection Clause of the Fourteenth Amendment. For in *Shapiro v. Thompson,* supra, the Court rejected the contention that a challenged classification could be sustained as an attempt to distinguish between old and new residents on the basis of the contribution they have made to the community through past payment of taxes.

412 U.S. at 450 n.6, 93 S.Ct. at 2235 n.6, 37 L.Ed.2d at 70–71 n.6. It is true that the language in *Shapiro* and *Vlandis* to which I have referred concerns tangible contributions: namely, the payment of taxes. But I do not believe that the Court's reasoning would be any different if the argument had been based on intangible contributions.[16] I do not believe that rewarding past contributions is a permissible objective for the same reason expressed in our decision invalidating the 1980 income tax statute:

> We believe that the reason the Supreme Court of the United States has indicated that it is not a "constitutionally permissible state objective," *Shapiro,* 394 U.S. at 633, [89 S.Ct. at 1330] 22 L.Ed.2d at 614, to apportion state benefits and services according to the past contribu-

tions of its citizenry, is that such a rationale logically could lead to pervasive and profound inequality in nearly all phases of a state's relationship with its citizens. That, in any event, is our view of the implications of the argument.

*Williams v. Zobel,* 619 P.2d 422, 429 (Alaska 1980) (plurality opinion).

As to the equity of such a distribution, I believe there must be equity for those younger, newer residents who have shown an inclination to settle in Alaska and make a commitment to the future of the state. I do not think the present program does this. I believe it has the effect of insulating long-term residents from sharing the state's oil wealth with newcomers during what is likely to be the critical years of the distribution of funds.

I think this statement applies to the children of Alaska as well. Take, for example, a one-year-old child whose parents have settled and lived in Alaska for some time and have committed themselves to make Alaska their home. The child is reared in Alaska, but under AS 43.23.010(b)(1) of the permanent fund statute, that child would not be eligible for a dividend until he or she is eighteen years old—which is seventeen years away. The rights of children are not protected under the program, so if it later becomes impossible to pay dividends the child would receive nothing. This can hardly be considered an "equitable distribution of ... the state's energy wealth to the

---

**16.** The majority finds two cases persuasive when concluding that rewarding past intangible contributions is a permissible purpose. These are *Starns v. Malkerson,* 326 F.Supp. 234 (D.Minn.1970), *aff'd without opinion,* 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971), and *Reeves, Inc. v. Stake,* —— U.S. ——, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980). These cases do not seem persuasive to me. When, as the majority notes, *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), cites *Starns* with approval, it is because *Starns* upheld a statute that imposed a one–year residency requirement as "merely one element ... to demonstrate bona fide domicile." 412 U.S. at 452 n.9, 93 S.Ct. at 2236 n.9, 37 L.Ed.2d at 72 n.9. Thus, the Supreme Court in *Vlandis* did not specifically approve of the district court's reliance on a past tax contributions rationale.

Even if this rationale can support a one–year residency requirement, I do not believe it can justify the perpetual distinctions which the statute before this court creates between residents on the basis of their length of residency in Alaska. The second case, *Reeves,* involves an interpretation of the commerce clause. As the majority notes, *Reeves* "upheld South Dakota's policy of selling cement from its state-owned plant only to state *residents.*" 619 P.2d at 460 (Alaska 1980) (emphasis added). South Dakota did not impose a durational residency requirement which residents would have to fulfill before buying cement from the state-owned plant. Thus, I do not believe *Reeves* is persuasive authority when determining the validity of a durational residency requirement under the equal protection clause.

people of Alaska." After all, children are "people," and, more importantly, are "persons" entitled to equal rights, opportunities, and protection under the law under article I, section 1, of the Alaska Constitution.

### III

To summarize, it is undisputed that the retrospective aspects of this legislation will lead to large present disparities in payments. It is impermissible, in my opinion, to justify these disparities on the theory that they will be erased at some future time, because that is simply untrue as to people who are similarly situated except for their past length of residency, and further because such a theory is uncertain and speculative in nature. This latter reason is especially forceful since the program depends primarily on the existence of a nonrenewable resource that one can reasonably assume will be exhausted in the not too distant future.

As indicated above, the state contends that three objectives justify the present disparities. Two of them—that of population turnover and the incentive to manage the permanent fund wisely, can best be accomplished by giving both long–term and short–term residents basic equality when distributing income payments from the earnings of the permanent fund. These objectives cannot justify the retrospective payment of dividends. The third objective, that of rewarding past contributions, raises serious federal and state constitutional equal protection issues. In considering the test of *State v. Erickson,* 574 P.2d 1 (1978), it is not necessary to consider any of these objectives in the final balancing approach used in that opinion. Two of them are plainly insufficient and the third, in my opinion, is not a legitimate state purpose.

Finally, I have grave reservations as to whether even prospective operation of this program would be valid. Although not presenting the same questions as the retrospective operation of the statute, I believe it is impermissible to create perpetual distinctions between classes of residents, as newcomers become state residents in the future.

The state's concern that our unique benefit programs should not serve as a "magnet" may well be justified. But I think that any distribution of state benefits must treat all bona fide Alaska citizens equally after a reasonable period of residence in the state.

I agree with Presiding Superior Court Judge Moody that the permanent fund distribution statute, in its present form, is unconstitutional as violating the equal protection clause of the Alaska Constitution, article I, section 1. I also believe that the statute violates the equal protection clause of the United States Constitution.