TORKKO/KORMAN/ENGINEERS, a Professional Corporation, Appellant,

v.

PENLAND VENTURES, An Alaska Limited Partnership, Appellee.

No. 6489.

Supreme Court of Alaska.

Nov. 18, 1983.

Raymond A. Nesbett, Anchorage, for appellant.

Jerome H. Juday and George M. Kapolchok, Atkinson, Conway, Bell & Gagnon, Anchorage, for appellee.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

RABINOWITZ, Justice.

This appeal arises from a dispute over the validity of a mechanic's lien filed by Torkko/Korman/Engineers (TKE) against an undeveloped parcel of land in Anchorage leased by Penland Ventures (Penland) from the State of Alaska. The superior court, ruling on the validity of the lien during foreclosure proceedings, held that TKE's lien was untimely and therefore a nullity. Final judgment was entered in favor of Penland and this appeal followed. We affirm, but on an alternative ground.

## I.

In July 1971, Robert C. Penney executed on behalf of Penland, Inc. a lease with the State of Alaska for a 162-acre parcel of land in northeast Anchorage. The lease stipulated that Penland, Inc. would develop the property "in whole or in part" as a Planned Unit Development (PUD). A PUD plan for the property was adopted.

Penland, Inc. subsequently assigned its interest to Penland Ventures (Penland).[1] In 1973, Penland successfully sought several amendments to the PUD plan for the entire 162-acre area. One of Penland's requests was that the density restrictions on tracts B–2 through B–5 (which comprise the 11.3 acres at issue here) be revised to permit townhouse condominiums as well as single-family residences. The Greater Anchorage Area Borough (GAAB) Planning and Zoning Commission subsequently gave "concept approval" to a density of fifteen units per acre on tracts B–2 through B–5. Final approval for the townhouse units was requested and received.

In April 1974, Penland granted to Polar Bear Builders, Inc. (Polar Bear) an option to sublease tracts B–2 through B–5. The contract contemplated that Polar Bear would perform actual construction on the property in accordance with the PUD plan.

During March 1974, Robert Sowash, president of Polar Bear, hired TKE to prepare the plans for the condominium project. TKE employed the California architectural firm of Kamnitzer, Marks, Lappin and Vreeland, Inc. (KMLV) to assist in this work. TKE and KMLV prepared the drawings and plans necessary for obtaining "final approval" from the GAAB Planning and Zoning Commission for a PUD on tracts B–2 through B–5. In late May of 1974 final approval was granted.

On June 15, 1974, TKE and Polar Bear entered into a written contract delineating their respective responsibilities during execution of the condominium project. Specif-

ic services were expressly included, and others excluded, from the scope of TKE's responsibilities. The project was divided into four phases, and fees were allocated accordingly, although the contract specifically stated that "[TKE's] fee is based upon the continuous involvement in the total project." Phase I fees were set at $58,500 and were due on September 1, 1974, regardless of whether Polar Bear had received a construction draw by that time.

After preparing the preliminary drawings and plans that enabled Polar Bear to obtain final approval for the project from the GAAB Planning and Zoning Commission, TKE and its subcontractors completed by July 1974 the detailed drawings and plans necessary for obtaining building permits and beginning construction.

Construction never began. In August 1974, TKE learned that the anticipated source for construction financing had declined to underwrite the project. TKE then wrote to Polar Bear concerning various possible means of securing payment of the Phase I fees. No agreement was reached. Thus, on September 1, 1974, TKE sent Polar Bear a statement of fees earned and due as of that date. The outstanding balance of $58,517.29 was for work done prior to September 1, 1974.

Polar Bear did not pay the bill. Charles Torkko of TKE moved the TKE offices to his home and took a full time position with another firm.[2] At Mr. Sowash's request, TKE and KMLV began canvassing developers for financing. In early 1975, Torkko personally discussed financing of the project with Mike Barry, a Penland general partner. On March 14, 1975, Torkko agreed to defer Phase I fees "until the new Owner/Developer/Contractor is able to make this lump sum payment" but no later than August 31, 1975. Throughout early 1975, Torkko devoted an average of four to five hours per week to meetings, conferences, and correspondence with potential sources

---

1. Penland is a limited partnership. One of the two general partners, Mike Barry, was Penland's sole witness at trial.

2. Torkko did not pay the $33,597.72 due KMLV and $4,000 due an electrical contractor.

of financing for the project.[3]  All efforts to salvage the project failed.  No site preparation, excavation or other physical preparatory work was ever started.  Design of Phase II was never begun.  Thus, in February 1975, Penland sued Polar Bear for breach of the first parcel sublease agreement.  On July 31, 1975, the sublease agreement was formally terminated.

KMLV filed and recorded a claim of lien against tracts B–2 through B–5 on April 25, 1975, claiming $33,597.72 due for labor and materials expended on the project.[4]  TKE filed its claim of lien against the property on May 2, 1975.  The claim stated that $58,517.29 was due TKE, an amount equal to the sum billed on September 1, 1974 which included the monies due KMLV.

KMLV filed suit to foreclose its lien, naming *inter alia* TKE and Penland as defendants.  TKE answered and cross-claimed for foreclosure of its lien.  TKE at this time also brought a third-party complaint against Polar Bear.  KMLV voluntarily dis-

missed its complaint, and the case proceeded on the cross-claim and third-party complaint.  On the eve of trial, Polar Bear confessed judgment in favor of TKE in the principal amount of $24,919.57 and the case went to trial with Penland as the sole defendant.

The superior court held that the ninety-day statutory period for filing a lien commenced to run on September 1, 1974, and that efforts expended by TKE after that date were beyond the scope of the contract with Polar Bear and therefore gratuitous.  The superior court further concluded that the lien was a nullity because it was filed more than ninety days after TKE's contractual obligations were fulfilled.[5]

## II.

On appeal, Penland contends that TKE's lien should be invalidated because no work was commenced on the project at the 11.3-acre site.[6]  Penland argues that the language of former AS 34.35.050[7] and the

3.  In late April and early May 1975, Torkko corresponded and met with a Hawaiian developer interested in purchasing the project.  Torkko stated that he was "still under obligation to Polar Bear Builders, Inc. and Bob Sowash for professional matters associated with [the] project," and indicated the developer was welcome to direct further inquiries to TKE.  However, Torkko refused to waive TKE's lien rights on the project and by May 12, 1975 it was clear the developer was no longer interested in it, for various reasons.

4.  Under AS 34.35.055(b) and (c) leasehold interests are lienable to the extent of the lessee's interest.

5.  The superior court deleted a proposed conclusion of law which provided that TKE had failed to prove that Penland derived any benefit from the totality of TKE's efforts, and based its decision entirely on the ground of untimeliness.
    Thereafter, TKE moved for amendment of the trial court's findings on the ground that the court had failed to rule on TKE's claim that Penland should be held personally liable for the amount claimed on the lien.  TKE's argument was based on former AS 34.35.070(d) (repealed 1978) and (f) (amended 1977, 1978 and 1979).  The superior court never ruled on this motion.  Apparently, the superior court file was transferred to this court after TKE filed its notice of appeal and the motion was thereafter not brought to the superior court's attention.

6.  A preliminary question raised by TKE is whether this issue is properly before this court, since Penland did not file a notice of cross-appeal pursuant to Appellate Rule 204(a).  TKE claims that the superior court ruled against Penland on this issue by crossing out a suggested finding stating in part that

   TKE has failed by a preponderance of the evidence to prove that tracts B2–B5 or that Penland Ventures as owner derived any benefit from the totality of the work performed by TKE

   and by finding in Conclusion No. 3 that "TKE could have filed its lien for the full amount of money billed for services rendered and due and owing on September 1, 1974."
   Penland claims that the superior court did not rule on the issue at all, although it was raised below in Penland's two trial briefs, and that this court may properly consider it as an alternative ground for affirmance.  *Carlson v. State,* 598 P.2d 969, 973 (Alaska 1979); *Stordahl v. Government Employees Insurance Co.,* 564 P.2d 63, 67 n. 16 (Alaska 1977).  We are in agreement with Penland and hold that the issue is properly before us in this appeal since it is open to Penland to urge this point as an alternative ground for affirmance.

7.  Former AS 34.35.050 (amended 1978 Alaska Sess.Laws, chap. 57, § 1) provided:
    *Lien for work done or materials furnished.*
    A person or firm, contractor, lumber mer-

"majority rule" in other jurisdictions support its assertion that a mechanic's lien will extend only to land upon which a building is constructed or other visible improvement effected. We find Penland's argument persuasive and affirm the superior court's judgment on this ground.

AS 34.35.050 provided, in pertinent part, that an engineer furnishing design services preliminary to site preparation or the construction of a building has "a lien on it for work done." *See supra* n. 7. The parties join issue over the meaning of the word "it." Penland argues that "it" refers only to the visible product of such labor and that no lien may arise before "it" materializes. TKE contends that "it" refers to the raw land as well as any improvements made upon that land. TKE argues that since the statute permits liens to be filed for engineering services preliminary to land clearing, grading, excavating, landscaping or the installation of water and sewer lines, "it" must refer to the ground on which the activity takes place. Furthermore, Torkko contends that since buildings become realty by virtue of the doctrine of annexation of fixtures, Penland's attempt to argue that "improvements" rather than land are lienable is legally untenable.

■ We find TKE's position unpersuasive. The plain meaning of the statute supports Penland's interpretation. The statute refers to construction of a building or structure or superstructure, and only then discusses the "clearing, grading, draining, excavating or landscaping of the ground upon which *it* is constructed." The word "it" clearly refers to a building, structure or superstructure. The statute then notes that the engineer "has a lien on *it*." "It" again refers to improvements that have been constructed upon the ground. All improvements contained in the statute are "visible" improvements. Since statutory liens are derived entirely from the legislative acts creating them, *Goebel v. National Exchangors, Inc.,* 88 Wis.2d 596, 277 N.W.2d 755, 760 (1979), our interpretation of AS 34.35.050 must comport with the express language of that provision.[8] Since TKE's efforts did not result in the visible improvements to the land contemplated un-

chant, architect, engineer, designer, mechanic, artisan, machinist, tradesman, plumber, electrician, carpenter, painter, laborer, teamster, drayman, equipment rental operator, or other person performing design or supervision services or performing labor upon or preliminary to the construction of, or furnishing material, or renting, leasing, or otherwise supplying equipment to be used in the construction of, or furnishing material, or renting, leasing or otherwise supplying equipment for the construction of, or furnishing material for the construction, alteration, or repair, either in whole or in part of a building, wharf, bridge, flume, fence, machinery, aqueduct, well, or land clearing, or a structure or superstructure, including the clearing, grading, draining, excavating or landscaping of the ground upon which it is constructed, and the installation of sewer and water lines in it has a lien on it for the work done or material furnished at the instance of the owner of the building or other improvement, or his agent.

It is undisputed that this appeal should be decided under the mechanic's lien statute in effect in 1975 when the lien in question was filed. As Penland points out, the legislature revised this statute (including AS 34.35.050) extensively in 1978 and 1979, but expressly provided that the amendments were inapplicable to liens arising from construction projects commenced prior to the effective date of the amendatory act, where the liens were for work completed or materials delivered within 120 days after the effective date of the Act. 1978 Alaska Sess.Laws, chap. 175, § 20(a). Unless otherwise stated, all references hereinafter to AS 34.35.050 will be to the version in effect prior to the effective date of the 1978 amendments.

8. We also note that AS 34.35.050 must be read with AS 34.35.055(a) which provides in part:

(a) The land upon which a building or other improvement described in section 50 of this chapter is constructed, . . . is also subject to the lien created by [sections] 50–120 of this chapter if, at the time the work is started . . . the land belongs to the person who causes the building or other improvement to be constructed, altered, or repaired.

Under AS 34.35.055(a), the land is only lienable under certain circumstances. This read together with section 50 necessarily implies that it is the improvements which are lienable under AS 34.35.050.

der AS 34.35.050, there cannot be a lien upon it.[9]

■ Authority from jurisdictions governed by lien statutes similar to former AS 34.35.050 supports our conclusion that physical construction must begin on property before architects and engineers aiding in the design of improvements are permitted to file liens.[10] One rationale for such an interpretation of lien statutes is apparent from our decision in *Frontier Rock & Sand v. Heritage Ventures,* 607 P.2d 364 (Alaska 1980):

> The philosophy [of lien statutes] is that a materialman or workman may reach the property which he has benefited to satisfy his claim for the benefit even when there is no direct contractual relationship between him and the owner of the property, and regardless of who the owner might be.

*Id.* at 367 (footnotes omitted). Under this view a mechanic's lien may attach to a property only after the services giving rise to the right result in a tangible improvement. Thus, the addition of value to land is the precondition to an attachment of a lien. Secondly, as the Iowa Supreme Court observed in *Gollehon,* 268 N.W.2d at 202 n. 13, a requirement that the land be visibly improved protects the rights of third party purchasers who are thereby put on notice that lienable claims may exist. 268 N.W.2d at 202.

■ It is likely that the legislature was aware of these interpretations of similar statutes when it amended former AS 34.35.-050 to allow explicitly for liens in this situation.[11] An amendment to an unambiguous

---

**9.** TKE contends that the record supports a finding that its services benefited Penland substantially, notwithstanding the fact that visible site preparation never commenced. TKE argues that its efforts enabled the PUD project to gain final approval from the GAAB Planning and Zoning Commission, a necessary precondition to construction, thus preventing Penland from defaulting on its lease with the state; the final approval also encompassed an increase in the density of dwelling units permitted per acre. However, these benefits did not inure to the land so as to increase the land's value. Rather, they benefited the lessor personally by increasing viability and profitability of its proposed construction project. Therefore, there was clearly no improvement to the *land* which would render it lienable under former AS 34.-35.050.

**10.** *See, e.g., Haines, Jones, Farrell, White, Gima Architects, Ltd. v. Maalaea Land Corp.,* 62 Hawaii 13, 608 P.2d 405, 407–08 (1980). Under a statute similar to ours, the court held an architect could not file a lien for services performed in designing a condominium project because construction was never begun and no "improvement" existed within the meaning of Hawaii's mechanic's lien statute. The court held that:

> In the present case, the appellant's minor remodelling, marking of boundaries, and test borings did not result in any actual or visible improvement to the land. Thus, the appellant did not establish probable cause to enable a lien to attach to the Maalaea property.

*Id.* 608 P.2d at 408. *See also Gollehon, Schemmer & Assoc. v. Fairway-Bettendorf Assoc.,* 268 N.W.2d 200, 202 (Iowa 1978) (architect's plans were never used because housing project was abandoned prior to bid submittal; court held that although architect surveyed and marked land in order to prepare maps and plans, produced such plans and procured municipal approval for platting, these services did not constitute sufficient "improvement" to warrant filing of lien).

**11.** AS 34.35.050 now provides:

> *Lien for labor or materials furnished.* A person has a lien, only to the extent provided under AS 34.35.005–34.35.530, to secure the payment of his contract price if he
>
> (1) performs labor upon real property at the request of the owner or his agent for the construction, alteration, or repair of a building or improvement;
>
> (2) is a trustee of an employee benefit trust for the benefit of individuals performing labor on the building or improvement and has a direct contract with the owner or his agent for direct payments into the trust;
>
> (3) furnishes materials that are delivered to real property under a contract with the owner or his agent which are incorporated in the construction, alteration or repair of a building or improvement;
>
> (4) furnishes equipment that is delivered to and used upon real property under a contract with the owner or his agent for the construction, alteration or repair of a building or improvement;
>
> (5) *performs services* under a contract with the owner or his agent *in connection with the preparation of plans, surveys, or architectural or engineering plans or drawings* for the construction, alteration or repair of a building or improvement, *whether or not actually implemented on that property;* or
>
> (6) is a general contractor. (Emphasis added.)

statute [12] is generally presumed to indicate a substantive change in the law, *City of Anchorage v. Thomas,* 624 P.2d 271, 273 (Alaska 1981). We therefore conclude that the legislature intended to confer additional rights upon architects and engineers when it amended AS 34.35.050 to allow liens for work done in the preparation of plans "whether or not [they were] actually implemented." AS 34.35.050(5). Thus, we interpret the prior version of the statute to prohibit the creation of a valid lien prior to the commencement of work on the site and the effectuation of visible improvements to the property.[13]

The superior court's judgment is AFFIRMED.[14]

MOORE, J., not participating.

---

**12.** *See supra* the discussion of the plain meaning of former AS 34.35.050.

**13.** In light of our conclusion that TKE was not entitled to a lien under former AS 34.35.050, we do not address the question of whether the lien was timely filed.

**14.** We do not address TKE's argument that Penland should be held personally liable for TKE's claim under former AS 34.35.070(d) (repealed 1978) and AS 34.35.070(f) (amended 1977, 1978 and 1979). Penland argues that TKE first raised the guaranty issue during closing argument at trial. It was not raised in TKE's pleadings. Although TKE did pray for a personal judgment against Penland, the request was predicated solely on an allegation that Polar Bear was Penland's agent. TKE did not discuss the guaranty issue in either its pre-trial brief, or its opening statement, but did raise it in its closing. After entry of final judgment, TKE moved for an amendment of the findings and judgment, alleging the superior court had failed to rule on the guaranty claim. The superior court never considered the motion because the case was transferred to this court before it was brought to its attention. Finally, TKE did not list the guaranty issue in its Points on Appeal. Thus, under App.Rule 210(e), it will not be considered by this court.

Alaska Rule Civ.P. 15(b) permits issues not raised in pleadings to be treated as if they had been so raised if they are tried by "express or implied consent of the parties." The record supports Penland's contention that the guaranty argument was not explicitly made until TKE's closing argument. In *Barrett v. Byrnes,* 556 P.2d 1254, 1255 (Alaska 1977), this court held that when an affirmative defense was raised for the first time after the plaintiff had rested her case, it could not be said to have been tried by her "implied consent." Similarly, here we hold that the guaranty issue was not tried at all in this case. During trial, TKE did extract a stipulation from Penland that no notice of completion had been filed, but this cannot be deemed to have put Penland on notice regarding the use that would be made of the stipulation. TKE never moved to amend its cross-claim to raise the guaranty argument.

Penland cites several decisions in which this court refused to consider legal theories, despite the availability of pertinent evidence in the record, when the opposing party had not been apprised of the importance of producing countervailing evidence and the court had not ruled on the issue. *Hill v. Ames,* 606 P.2d 388, 390 (Alaska 1980); *Brown v. Wood,* 575 P.2d 760, 766 (Alaska 1978), modified on *other grounds,* 592 P.2d 1250 (Alaska 1979). *See also, Saxton v. Splettstoezer,* 557 P.2d 1126, 1127 (Alaska 1976); *Kupka v. Morey,* 541 P.2d 740, 747 (Alaska 1975). We adhere to those decisions.