**STATE of Alaska, DEPARTMENT OF REVENUE, PERMANENT FUND DIVIDEND DIVISION, Petitioner,**

v.

**Arturo COSIO and Tomas Cosio, Respondents.**

**No. 3998.**

Supreme Court of Alaska.

Aug. 20, 1993.

Joyce James, Vincent L. Usera, Asst. Attys. Gen., Charles E. Cole, Atty. Gen., Juneau, for petitioner.

Helen L. Simpson, Simpson & Thompson, Anchorage, for respondents.

Jeffrey D. Mahlen, Asst. Public Defender, John B. Salemi, Public Defender, Anchorage, for Alaska Public Defender Agency, amicus curiae.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON, and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

Under AS 43.23.005(a)(1) a "state resident" is entitled to receive a permanent fund dividend. Alaska Statute 43.23.095(8) defines "state resident" as "an individual who is physically present in the state with the intent to remain permanently in the state...." From 1985 to 1987, Arturo and Tomas Cosio were in the United States illegally. During that period, however, both men were physically present in Alaska and intended to remain. The Cosios claim they were "state residents" within the meaning of AS 43.23 and thus entitled to a permanent fund dividend.

The Cosios applied for permanent fund dividends in each of the three years at issue. They received dividends for 1985 and 1986, but were denied dividends for 1987. Additionally, the State demanded repayment of the 1985 and 1986 dividends. The Cosios administratively appealed the State's actions. Following a hearing, the hearing officer ruled that the Cosios were ineligible to receive dividends from 1985 through 1987 under a regulation which stated: "An alien with resident alien status or a refugee otherwise qualifying under [the provisions of state law pertaining to such eligibility] is eligible to receive a permanent fund dividend." 15 Alaska Administrative Code (AAC) 23.615(d) (1988). This ruling was subsequently adopted by the commissioner of the Department of Revenue.

The Cosios appealed to the superior court. The court ruled that the regulation was inconsistent with the statutory definition of "state resident" and was therefore invalid: "[T]he establishment of the immigration status of resident alien as the minimal threshold required for alien eligibility, however convenient, is inconsistent with the plain language of the statute which determines residency by a *person's* intent." The State petitioned for review from this ruling. We granted the petition.

The legislature has authorized the commissioner of the Department of Revenue to promulgate regulations implementing the permanent fund dividend program. Alaska Statute 43.23.015(a) provides:

**Application and proof of eligibility.** (a) The commissioner shall adopt regulations under the Administrative Procedure Act (AS 44.62) for determining the eligibility of individuals for permanent fund dividends. The commissioner may require an individual to provide proof of eligibility, and the commissioner may use other information available from other state departments or agencies to determine the eligibility of an individual.

Alaska Statute 43.23.055(2) provides:

**Duties of the department.** The department shall

....

(2) adopt regulations under the Administrative Procedure Act (AS 44.62) that establish procedures and time limits for claiming a permanent fund dividend;

....

Pursuant to this authority, the commissioner promulgated 15 AAC 23.615(d), which limits dividend eligibility to aliens who are resident aliens or refugees.

## I. *The regulation is authorized by statute.*

■ Initially, we must determine whether the authorizing statutes require the commissioner to promulgate procedural regulations, substantive regulations, or both. Section .055(2) clearly limits the commissioner's authority to adoption of *procedural* regulations concerning dividend applications and proof of dividend eligibility. Section .015(a), on the other hand, can reasonably be read to encompass both procedural *and substantive* regulations. We conclude that section .015(a) requires the commissioner to adopt regulations setting substantive eligibility requirements for permanent fund dividends.

We reach this conclusion for two reasons. First, if the legislature had intended the delegation contained in .015(a) to pertain strictly to matters of procedure, the legislature likely would have used language plainly expressing this limitation, as it did in AS 43.23.055(2). Second, if the legislature intended only a procedural meaning, AS 43.23.015(a) would be superfluous because of the presence of section .055(2). Since no statute should be construed to be merely superfluous if it reasonably has another meaning, *Homer Electric Association v. Towsley*, 841 P.2d 1042, 1045 (Alaska 1992), we conclude that section .015(a) delegates authority to the commissioner to promulgate regulations dealing with substantive eligibility requirements.

■ This case, therefore, reduces to a single question: whether 15 AAC 23.615(d), as construed by the hearing officer and the commissioner to restrict permanent fund dividend eligibility to aliens with resident alien or refugee status, falls within the commissioner's delegated authority to regulate the eligibility of individuals for permanent fund dividends. In answering this question, we accord the administrative regulation a presumption of validity; the party challenging the regulation bears the burden of demonstrating invalidity. *Alaska Int'l Indus. v. Musarra*, 602 P.2d 1240, 1245 n. 9 (Alaska 1979). We review a "legislative" type of regulation, such as is presented here, with considerable deference:

> First, we will ascertain whether the regulation is consistent with and reasonably necessary [1] to carry out the purposes of the statutory provisions conferring rule-making authority on the agency. This aspect of review insures that the agency has not exceeded the power delegated by the legislature. Second, we will determine whether the regulation is reasonable and not arbitrary. This latter inquiry is proper in the review of any legislative enactment.

*Kelly v. Zamarello*, 486 P.2d 906, 911 (Alaska 1971). We will not substitute our judgment for that of the agency with respect to the efficacy of the regulation nor review the "wisdom" of a particular regulation. *Alaska Int'l Indus. v. Musarra*, 602 P.2d at 1245 n. 9.

■ The commissioner argues that the regulation in question adds a permissible gloss to the statutory phrase "intent to remain permanently in the state," AS 43.-23.095(8). The commissioner cites *Whaley v. State*, 438 P.2d 718 (Alaska 1968), as authority for the proposition that an agen-

---

1. If we find the proper nexus between the challenged regulation and the statutory purpose (i.e., the regulation is consistent with the statutory purpose), we do not generally require a separate showing of reasonable *necessity.* Strictly applied, inquiry into whether a regulation is *necessary* as a means to a legislative end would mire this court in questions of public policy and the advisability of possible alternatives. Such a searching inquiry is beyond our authority and expertise. It is a rare case where a regulation, although not inconsistent with the purpose of the statute, is wholly superfluous to the achievement of that purpose.

cy having authority to make legislative regulations may by regulation refine and add meaning to statutory language. In *Whaley*, various personnel rules excluded probationary or provisional employees from the statutory classification "employee[s] in the classified service" although the statute itself did not contain such an exclusion. We upheld the exclusion as within the authority of the director of personnel:

> Such interpretative rules were made pursuant to statutory authority, and appellant does not point out, nor do we perceive, that those rules are unreasonable and not in accord with the terms and purposes of the statute pursuant to which they were adopted. We have no basis for not upholding such an administrative interpretation of AS 39.25.170 [the statute using the term "employee in the classified service"], particularly in view of the well settled rule that requires courts to give consideration and respect to the contemporaneous construction of a statute by those charged with its administration, and not to overrule such construction except for weighty reasons.

*Id.* at 722 (footnote omitted). We decided, then, that the agency in *Whaley* had the authority to promulgate a regulation that excluded employees who arguably fell within the statute's definition. Similarly, in this case we agree that the commissioner has the authority to promulgate a regulation excluding permanent fund dividend applicants who arguably fall within the statutory definition of eligible applicants. That exclusion, however, must still be consistent with the statutory purpose and "reasonable and not arbitrary." *Kelly v. Zamarello*, 486 P.2d at 911.

■ These conditions are met. The objective of AS 43.23.095(8) is to limit payment of dividends to permanent residents. Those who are present in the state illegally may reasonably be seen to fall outside of this category. The challenged regulation accomplishes this. The commissioner justifies this regulation by, in effect, interpreting the statutory phrase "intent to remain permanently" to mean "intent to *lawfully* remain permanently," inferring a requirement of lawful action from the statute.

We have made similar inferences in other statutory contexts. For example, in *Colville Environmental Services v. North Slope Borough*, 831 P.2d 341, 349 (Alaska 1992), a statute gave grandfather rights to municipalities which provided garbage collection services before a certificate of authority was granted to a competing provider of such services. The question was whether the statutory language "provided similar services" referred to all services or only lawfully provided services. We construed the statute to apply only where the municipality had lawfully provided services. Similarly, in *Simpler v. State Commercial Fisheries Entry Commission*, 728 P.2d 227, 230 (Alaska 1986), the litigant challenged an agency regulation that required prior fishing as the holder of both an interim-use permit *and* a gear license in order to qualify for grandfather rights in a fishery. The regulation was challenged as inconsistent with the authorizing statute which only required prior fishing as the holder of a gear license. We upheld the regulation, noting that one could not legally fish without both a gear license and an interim-use permit. The regulation was held to be consistent with the act based on the inference that the legislature intended to establish eligibility based on lawful participation. *Id.* Underlying both of these decisions is an assumption that the legislature did not intend to reward unlawful conduct. The commissioner was entitled to make the same assumption in this case.

One objective of section .015(a) is to require the commissioner to make substantive regulations resolving questions as to who is and who is not a permanent resident. 15 AAC 23.615(d) is such a regulation. It makes abundant sense to conclude that aliens who may not legally live in Alaska are not permanent residents for dividend purposes. To exclude such people from the permanent fund dividend program is consistent with a public policy which regards it as unwise to reward illegality. The regulation, therefore, is not invalid on statutory grounds.

## II. *The regulation is constitutional.*

Amicus contends that 15 AAC 23.615(d) is unconstitutional because dividend eligibility depends upon a classification that burdens aliens who are not resident aliens or refugees. Amicus argues that this classification denies the excluded aliens equal protection of the law under the state equal rights provision, article I, section 3 of the Alaska Constitution, and under the Fourteenth Amendment to the United States Constitution.[2]

### A. Federal Equal Protection

 Like ancient Gaul, modern analysis under the federal equal protection clause[3] is divided into three parts. First, the United States Supreme Court has reserved its most searching review—strict scrutiny—for legal classifications that burden suspect classes of individuals or that burden a fundamental right. Only classifications based on race, alienage, and national origin merit strict scrutiny. Strict scrutiny requires that the government show that its law is narrowly tailored to the achievement of a compelling government interest. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493–94, 109 S.Ct. 706, 721–22, 102 L.Ed.2d 854 (1989) (plurality opinion). Laws often fail to survive strict scrutiny, prompting one commentator to label the test " 'strict' in theory, and fatal in fact." Gerald Gunther, *The Supreme Court Term 1971—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for Newer Equal Protection,* 86 Harv.L.Rev. 1, 8 (1972); *but see Korematsu v. United States,* 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944).

 Second, the Supreme Court applies a less searching form of review—intermediate scrutiny—to legal classifications that burden quasi-suspect classes. Thus far, the Supreme Court has applied intermediate scrutiny to classifications based on gender and illegitimacy. *See, e.g., Mills v. Habluetzel,* 456 U.S. 91, 99, 102 S.Ct. 1549, 1555, 71 L.Ed.2d 770 (1982) (illegitimacy); *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982) (gender). Under intermediate scrutiny, the government must show that its law bears a substantial relationship to an important government interest. *Hogan,* 458 U.S. at 724, 102 S.Ct. at 3336.

 Third, the Supreme Court reviews all other legal classifications under its most deferential standard of review—rational basis. Under rational basis review, the government only need show that the challenged law is rationally related to the attainment of a legitimate state interest. *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 174–75, 101 S.Ct. 453, 459, 66 L.Ed.2d 368 (1980). Rational basis review is often as permissive as strict scrutiny is fatal. *See* Laurence Tribe, *American Constitutional Law* § 16–3, at 1443 (1988). Occasionally, however, the Supreme Court has intensified its gaze and subjected a law to a more searching inquiry, ultimately striking down the law under rational basis review. *See, e.g., City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). One commentator refers to this stricter review as "covertly heightened scrutiny" under which the Court increases the government's task in justifying the challenged law. Tribe, *supra,* § 16–33, at 1612.

 The Cosios, as illegal aliens, do not automatically fall within one of the three pre-set categories. Where they do fall is best discovered by examining *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). In *Plyler,* Texas denied public school funding for the children of illegal aliens. The Court began its analysis with a recognition that illegal aliens,

---

**2.** Amicus also argues that the classification violates the state and federal guarantees of due process of law and invades the exclusive federal power over immigration. Since neither of these points is reasonably arguable, we do not address them.

**3.** "No state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1, cl. 4.

as a class, merit merely rational basis review: "Undocumented aliens cannot be treated as a suspect class because their presence in this country in violation of federal law is not a 'constitutional irrelevancy.'" *Id.* 457 U.S. at 223, 102 S.Ct. at 2398. The Court, however, ultimately held the State to a higher standard, concluding that the challenged law "can hardly be considered *rational* unless it furthers some *substantial* goal of the State." *Id.* 457 U.S. at 224, 102 S.Ct. at 2398 (emphasis added). Thus, while reviewing the Texas law under the "rational" basis test, the Court required the State to produce a "substantial," as opposed to merely "legitimate," state interest. In doing so, the Court seemed to employ its intermediate level of scrutiny.

*Plyler* indicates that the Court's increased scrutiny cannot be attributed solely to the fact that the challenged law burdened illegal aliens. Rather, the Court offered two important reasons for subjecting the Texas law to higher scrutiny:

> [ (1) The state law] imposes a lifetime hardship on a discrete class of children *not accountable for their disabling status.* [ (2) ] The *stigma* of illiteracy will mark them for the rest of their lives. By denying these children a basic education, we deny them the ability to live within the structure of our civic institutions, and foreclose any realistic possibility that they will contribute in even the smallest way to the progress of our Nation.

*Id.* 457 U.S. at 223, 102 S.Ct. at 2398 (emphasis added). Neither of these reasons exists in the present case. First, the Cosios, both adults, are fully "accountable for their disabling status." Second, a permanent fund dividend is not comparable to education, the deprivation of which leaves the victim irretrievably stigmatized. Rather, a dividend is a matter of grace, a "governmental 'benefit' indistinguishable from other forms of social welfare," *id.* 457 U.S.

at 221, 102 S.Ct. at 2397, which the *Plyler* Court suggested merits mere rational basis review. Thus, the State's dividend eligibility requirement only warrants rational basis review.

 As we have recognized elsewhere, three main purposes underlie the Alaska permanent fund dividend program:

> (1) to provide a mechanism for *equitable distribution* to the people of Alaska of at least a portion of the state's energy wealth derived from the development and production of the natural resources belonging to them as Alaskans;
>
> (2) to encourage persons to *maintain their residence* in Alaska and to *reduce population turnover in the state;* and
>
> (3) to encourage *increased awareness and involvement by the residents* of the state in the management and expenditure of the Alaska permanent fund....

Ch. 21, § 1(b), SLA 1980 (emphasis added), *quoted in Williams v. Zobel,* 619 P.2d 448, 458 (Alaska 1980), *rev'd,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982). We believe that the program's permanent residence requirement, as interpreted to require "legal" residence, is rationally related to the attainment of these legitimate purposes.[4]

 First, we agree with the State that "giving dividends to illegal aliens would ... contravene public policy by rewarding individuals for illegal acts." The State may properly determine that it is inequitable to give the same treatment to those who gain their resident status illegally as opposed to those who do so legally. Compliance with the law is a legitimate consideration when the legislature considers entitlement to public funds. Thus, a regulation distinguishing between law-abiding and law-breaking state residents, and rewarding the former, is rationally related to the purpose of equitably distributing income from the permanent fund.

---

4. The State also argues that the "primary objective" of its regulation is "to preserve the distribution of state benefits to those properly entitled to receive them...." Taken alone, this is a tautology: those whom the State excludes from

dividend eligibility are, by definition, not "properly entitled" to a dividend; thus, their exclusion furthers the State's primary objective. Under this view, any eligibility requirement would be supported by the State's "primary objective."

Second, permanent fund dividends should "encourage persons to maintain their residence in Alaska and to reduce population turnover...." To this end, the legislature has specifically limited dividend eligibility to permanent residents of the state. AS 43.23.005(a)(1). The commissioner has defined permanent residence with regard to one's *ability* to remain permanently. This definition is rational because one's "intent to remain permanently" means little without the right or ability to effectuate that intent. Since compliance with federal immigration laws is a prerequisite for one's continued ability to reside in this state, resident alien or refugee status is an adequate proxy for, and thus rationally related to ascertaining, an individual's *meaningful* "intent to remain permanently" in Alaska.

Third, the State has legitimately tailored dividend eligibility to "encourage increased awareness and involvement by the residents of the state in the management and expenditure of the Alaska permanent fund." The state constitution requires that twenty-five percent of "all mineral lease [revenues] be placed in [the] permanent fund...." Alaska Const. art. IX, § 15.[5] The principal of the fund must remain to produce income; the income from the fund, however, may be allocated as "provided by law." *Id.* The legislature has provided that half of the fund's annual income available for distribution must be available for dividends. AS 37.13.145(b). The other half of annual income is currently reinvested in the fund directly or in the earnings reserve account of the fund. These allocations are subject to legislative change.

The dividend program was intended to create a constituency in the voting public which would favor reinvestment of permanent fund earnings rather than using such earnings to finance new government programs or to defray the expenses of existing ones. *Zobel,* 619 P.2d at 462. These voters would, in turn, influence legislative decisions concerning the allocation of permanent fund revenue. The result would be an eventual increase in the size of the permanent fund and a deferral of the use of permanent fund earnings for government operations until the earnings are truly needed for that purpose.

This purpose could well be achieved by limiting dividend recipients to Alaska residents eligible to vote. In the original dividend program enacted in 1980, Ch. 21 SLA 1980, children were excluded from dividend eligibility. In 1982, after three justices of this court had expressed doubts concerning the constitutionality of this exclusion,[6] the legislature expanded the class of dividend recipients to include children. Similarly, the exclusion of aliens who are legal residents of the state could raise serious constitutional questions.[7] Thus, the commissioner's inclusion of legal aliens among those eligible to receive dividends can be viewed as a prudent response to current constitutional learning. Dividend recipients thus include those eligible to vote and those whose exclusion would raise serious constitutional questions.[8] Such a classification is rationally related to the third purpose of the dividend program.

In sum, the commissioner's eligibility requirements are rationally related to the

---

5. Currently 50% of all lease revenues are placed in the fund. AS 37.13.010(a)(2).

6. *Zobel,* 619 P.2d at 464 (concurring opinion of Burke, Justice); 471, 472 (dissenting opinion of Dimond, Senior Justice, joined by Matthews, Justice).

7. The exclusion of legal aliens could raise a federal equal protection question reviewable under strict scrutiny. *See, e.g., Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971).

8. We note that there are narrow classes of aliens who may be legally present in Alaska who are neither resident aliens nor refugees.

Asylees constitute one such class. AS 43.23.005 was amended in 1992 to specify asylees as a class eligible for permanent fund dividends. Ch. 4, § 4, SLA 1992; *see* AS 43.23.005(a)(5)(D). By regulation, the commissioner has also extended eligibility to those aliens who have been granted "conditional resident status." 15 AAC 23.153(b). If there are other aliens who are legally present who do not meet the eligibility requirements of the regulations, they may have valid claims that their exclusion from dividend eligibility is unconstitutional. The Cosios, however, are not in a position to raise this argument for those individuals.

achievement of the three legitimate purposes underlying the permanent fund dividends. For this reason, 15 AAC 23.615(d) survives scrutiny under the federal equal protection clause.

## B. Alaska Equal Protection

■■■ Analysis under our state equal protection clause[9] is considerably more fluid than under its federal counterpart. Instead of using three levels of scrutiny, we apply a sliding scale under which "[t]he applicable standard of review for a given case is to be determined by the importance of the individual rights asserted and by the degree of suspicion with which we view the resulting classification scheme." *State v. Ostrosky*, 667 P.2d 1184, 1192–93 (Alaska 1983). As the right asserted becomes "more fundamental" or the classification scheme employed becomes "more constitutionally suspect," the challenged law "is subjected to more rigorous scrutiny at a more elevated position on our sliding scale." *Id.* at 1193.

■■■ The importance of the asserted right and the suspectness of the classification scheme determine the ends-means scrutiny to be applied. Our general approach is as follows:

As the level of scrutiny selected is higher on the [sliding] scale, we require that the asserted governmental interests be relatively more compelling and that the legislation's means-to-ends fit be correspondingly closer. On the other hand, if relaxed scrutiny is indicated, less important governmental objectives will suffice and a greater degree of over/or underinclu-

siveness in the means-to-ends fit will be tolerated.

*Id.* (footnote omitted).

■■■ In the present case, we see no reason why 15 AAC 23.615(d) warrants greater than minimal scrutiny under our state equal protection analysis. First, "[a] dividend is merely an economic interest and therefore is entitled only to minimum protection under our equal protection analysis." *State v. Anthony*, 810 P.2d 155, 158 (Alaska 1991). Second, Amicus has provided no reason why the classification "persons who have voluntarily failed to comply with the United States immigration laws"[10] should receive greater than minimal equal protection scrutiny. For these reasons, we apply minimal scrutiny under our state equal protection analysis.

■■■ Minimal scrutiny under our state constitution may be more demanding than under the federal constitution. As under the federal constitution, the challenged exclusion must be designed to achieve a "legitimate" governmental objective; however, the exclusion must bear a "fair and substantial" relationship to the accomplishment of the legitimate objective.[11] As discussed above, we have concluded that limiting the distribution of dividends to those who are lawful permanent residents is rationally related to legitimate objectives of the dividend program; we also conclude, for the same reasons that the limitation is fairly and substantially related to these goals. Thus, 15 AAC 25.615(d) survives rational basis review under our state equal protection method of review.

We REVERSE the decision of the superior court invalidating 15 AAC 25.615(d) and

**9.** "SECTION 3. Civil Rights. No person is to be denied the enjoyment of any civil or political right because of race, color, creed, sex, or national origin. The legislature shall implement this section." Alaska Const. art. I, § 3.

**10.** Amicus cites *Park v. State*, 528 P.2d 785 (Alaska 1974), for the proposition that classifications based on "alienage" receive heightened equal protection scrutiny. Amicus is correct on this point. Amicus, however, misses a fundamental characteristic of the present case: the Cosios were both *illegal* aliens during the rele-

vant time period. We believe that the *Plyler* Court was correct in finding this illegality relevant to the constitutional analysis. For this reason, *Park* is inapposite.

**11.** *State v. Anthony*, 810 P.2d at 158. This formulation may involve more scrutiny than merely asking whether the connection between how the statute works and the achievement of its goal is "rational"; whether it is a more demanding standard depends on how rigorously "rational" is defined.

REMAND for proceedings consistent with this opinion.

BURKE, Justice, dissenting.

I respectfully dissent from the court's decision upholding 15 AAC 23.615(d) as a valid exercise of the Department of Revenue commissioner's regulatory authority. I do not agree that 15 AAC 23.615(d), which excludes most classes of aliens from dividend eligibility, is consistent with or reasonably necessary to carry out the statutory purposes of AS 43.23.005(a)(1) and AS 43.23.095(a).[1] Nor do I agree that the legislature delegated authority to the commissioner to pass a regulation which actually changes the eligibility standard.

The Permanent Fund Dividend Division (hereafter "department") declared Arturo and Tomas Cosio ineligible to participate in the Permanent Fund Dividend Program, AS 43.23, based on a department regulation, 15 AAC 23.615(d). Before it was repealed in 1989,[2] the regulation stated: "An alien with resident alien status or a refugee otherwise qualifying under [the provisions of state law pertaining to such eligibility] is eligible to receive a permanent fund divi-

dend." 15 AAC 23.615(d). Because the Cosios' federal immigration status during the dividend years in question was other than "resident alien" or "refugee," the department declared them ineligible.

The superior court reversed this decision on appeal, ruling that there was an impermissible conflict between the department's eligibility requirements and those established by the legislature in AS 43.23.005(a)(1) and .095(8). *Cosio v. State*, No. 3AN–82–6892 Civ. (Alaska Super. December 13, 1990). The court noted that only "state resident[s]" qualify to receive permanent fund dividends. AS 43.23.005(a)(1). It further noted that "state resident" is defined as "an individual who is physically present in the state with the intent to remain permanently in the state." AS 43.23.095(8). The superior court then held:

> Since [the legislature has declared that] eligibility is determined by the applicant's intent, the [department] may not deny eligibility based on someone else's intent. Immigration status is one factor which may be considered in evaluating an applicant's intent, but it is not deter-

---

1. Most of the statutes involved in this appeal were substantially revised in 1991 and 1992. These revisions do not apply to the Cosios and will not affect my analysis. I recognize that AS 43.23.005 now requires that an individual, in addition to being a state resident, either be a United States citizen or a permanent resident, refugee or asylee in order to be eligible for a permanent fund dividend.

This change in the statute does not deter me from concluding that 15 AAC 23.615(d), a *regulation* creating a similar standard, is invalid both because the Department of Revenue commissioner had no authority to create a stricter eligibility standard and because the regulation is inconsistent with the statute in its old form. As for the legislative history suggesting that the present legislature was trying to validate the regulation by amending the statute to *clarify* rather than *change* the existing law, I note this court's discussion in *Hillman v. Nationwide Mut. Fire Ins. Co.,* 758 P.2d 1248, 1252 (Alaska 1988), wherein we stated that "[w]hile the legislature is fully empowered to declare present law by legislation, it is not institutionally competent to issue opinions as to what a statute passed by an earlier legislature meant." *See also Wrangell Forest Prod. v. Alderson,* 786 P.2d 916, 918 n. 1 (Alaska 1990). If anything, the change in the law supports my conclusion that the prior stat-

ute does not permit immigration status to be used to establish *per se* dividend ineligibility. As we noted in *Hillman,* an "amendment to an unambiguous statute is generally presumed to indicate a substantive change in the law." *Hillman,* 758 P.2d at 1252 (quoting *Torkko/Korman/Engineers v. Penland Ventures,* 673 P.2d 769, 773–74 (Alaska 1983)). I believe the old statute defining "state resident" for dividend eligibility purposes was completely unambiguous, and that the new statutory language must be read to effect a change in the law.

2. The Alaska Administrative Code currently contains the following provision:

(a) An alien who before January 1 of the qualifying year has been granted permanent resident under 8 U.S.C. 1101(a)(20), refugee status under 8 U.S.C. 1157 and 8 U.S.C. 1159, or asylum under 8 U.S.C. 1158 and who otherwise qualifies is eligible for a dividend.

(b) An alien who has been granted conditional resident status meets the requirements of permanent resident status under (a) of this section.

(c) An alien who does not fall within the provisions of (a) or (b) of this section is not eligible for a dividend.

15 AAC 23.153.

minative under the current statute, without amendment.

*Cosio v. State, Dept. of Revenue,* No. 3AN–82–6892 Civ. at 4. (Alaska Super., December 13, 1990). The superior court declared the regulation invalid, and the case came to this court for review.

## I

The first question I address is the proper degree of deference to be afforded the department's regulation. The court does not directly address the proper standard to be used to review the department's interpretation of the phrase "intent to remain permanently in the state." [3] AS 43.23.-095(8). The court instead looks to the statutes which authorize the commissioner of the Department of Revenue "to promulgate regulations implementing the permanent fund dividend program." Maj.Op. at 623. The court states that AS 43.23.015(a), providing that the commissioner "shall adopt regulations ... for determining the eligibility of individuals for permanent fund dividends," requires the commissioner to set "substantive eligibility requirements." Maj.Op. at 624. The court then concludes that this statutory authority also permits the commissioner "to promulgate a regulation *excluding permanent fund dividend applicants who arguably fall within the statutory definition of eligible applicants.*" Maj.Op. at 625 (emphasis added).

In my view, the court's arguments on this point are flawed, and the entire discussion is misdirected. The court notes that, in addition to AS 43.23.015(a), the legislature authorized the department to "adopt regulations that establish procedures and time limits for claiming a permanent fund dividend." Maj.Op. at 624 (*quoting* AS 43.-23.055(2)). The court then concludes that AS 43.23.015(a) would be superfluous if it were read to only grant the commissioner the authority to promulgate "procedural regulations" because section .055(2) already provides this authority. Slip Op. at 4.

First of all, the regulatory authority granted by section .015(a) is plainly distinct from section .055(2). The former section provides the commissioner the authority to adopt criteria and proofs for a claimant to *establish* dividend eligibility.[4] The later section requires the department to adopt regulations setting the procedures and time limits for *claiming* a dividend. Thus, section .015(a) allows the department to regulate the eligibility determination process and section .055(2) allows it to set up general procedures for claiming dividends. There is nothing redundant or superfluous about these separate grants of regulatory authority.

Furthermore, I would not dispute that AS 43.23.015(a) delegates to the commissioner *some* substantive or quasi-legislative rulemaking authority. Assessment of a person's subjective intent is often difficult, and when a particular intent will entitle an applicant to receive a substantial sum of money, there will always be those willing to alter the truth. Thus, it is clear that the legislature gave the department the authority under AS 43.23.015(a) to adopt regulations which allow it to evaluate an applicant's subjective intent, to the extent possible, by means of objective criteria.[5] *See*

---

**3.** The department claims that because 15 AAC 23.615(d) interprets the statutory phrase "intent to remain permanently" and provides an objective standard for determining eligibility, adoption of the regulation "implicate[s] special agency expertise [and/or] the determination of fundamental policies within the scope of the agency's statutory function." *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 903 (Alaska 1987). Thus, the department urges this court to apply the "rational basis" standard in examining its actions. *Id.*

**4.** The legislature's purpose in passing this section is made apparent from the second sentence

of the section which provides that "the commissioner may require an individual to provide proof of eligibility, and the commissioner may use other information available from other state departments or agencies to determine the eligibility of an individual." AS 43.23.015(a).

**5.** An example of this type of regulation would be 15 AAC 23.143. Subsection (a) provides in part:

An individual's intent to establish residency, remain permanently in Alaska, or return to Alaska and remain permanently is demonstrated through the establishment and mainte-

*State v. Anderson,* 749 P.2d 1342, 1345 n. 8 (Alaska 1988) ("an agency does not need a specific grant of power to adopt each individual provision of a regulation"). However, contrary to the present court's analysis, the fact that the commissioner has *some* quasi-legislative rulemaking authority does not end the inquiry into the department's authority to adopt 15 AAC 23.615(d). The key question is whether the subject matter of the regulation is within the scope of authority which the legislature conferred on the commissioner.

As we noted in *Kelly v. Zamarello,* 486 P.2d 906, 911 (Alaska 1971):

> Certain provisions of the Alaska Administrative Procedure Act provide guidance as to the standard of review for regulations adopted pursuant to an administrative agency's quasi-legislative rule-making function. AS 44.62.020 states in part:

> To be effective, each regulation adopted must be within the scope of authority conferred and in accordance with standards prescribed by other provisions of law.

> AS 44.62.030 states:

> If, by express or implied terms of a statute, a state agency has authority to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, a regulation adopted is not valid or effective unless consistent with and reasonably

necessary to carry out the purposes of the statute.

In deciding whether the regulation is "effective" under AS 44.62.020 as "within the scope of authority conferred" by the legislature, this court's job is to determine if "the legislature has intended to commit to the agency discretion as to the particular matter that forms the subject of the regulation." *Id.; see generally Anderson,* 749 P.2d at 1344–45.

I find no indication in the language of AS 43.23.015(a) that the legislature intended to commit the dividend eligibility of certain classes of immigrants to the department's discretion.[6] As we implicitly recognized in *Anderson,* legislative delegation is usually done when "the agency has the necessary expertise to determine the best means" of accomplishing a particular legislative goal. *Id.* at 1345. In this case, the subject matter of the regulation does not relate to the means of *proving* dividend eligibility, arguably something within the department's field of expertise. The regulation, in fact, amounts to the department's legal conclusion that certain classes of immigrants do not have the capacity to legally "intend to remain permanently in the state."[7]

The court's opinion does not even attempt to provide, nor do I perceive, a sound basis for concluding that the legislature intended the department to use its discretion to further define the qualities of a "state resident," particularly by means of federal immigration status. The definition of "residency" as "physical presence plus a

---

nance of customary ties indicative of Alaska residency and the absence of those ties elsewhere. *Id.* Another example is 15 AAC 23.173, which lists specific indicia of intent as "proof of eligibility." Similar regulations covering the dividend years at issue in this case, 1985–87, were repealed in 1989. *See* 15 AAC 23.030(b) and .050(b) *repealed 4/1/89.*

**6.** Nor do I agree that the commissioner was authorized to "make substantive regulations resolving questions as to who is and who is not a permanent resident." Slip Op. at 8. The determination of who is a "state resident" was accomplished by the legislature when it passed AS 43.23.095(8) which unambiguously defines the term. The legislature simply authorized the commissioner to promulgate rules and proce-

dures which would allow the department to divine which applicants truly satisfy the definition.

**7.** The misdirection aspect of the court's analysis becomes apparent at this point. It does not really matter whether the commissioner has quasi-legislative rulemaking authority in general; it only matters whether 15 AAC 23.615(d) was passed pursuant to that authority or whether it is actually an example of a so-called "interpretive regulation." *See Kelly,* 486 P.2d at 909. Even the department acknowledges that the regulation is simply interpreting a statutory phrase. In its brief, the department proclaims that "[a]t issue in this case is the validity of a regulation interpreting the statutory phrase 'intent to remain permanently.'" Brief of Petitioner at 5.

*subjective* intent to remain permanently" is a particularly legal concept well known to this court and, presumably, the legislature. The Permanent Fund Dividend Division has no special expertise in this area, much less is it an expert in the intricacies of federal immigration law.[8]

As noted above, the department must certainly be afforded some deference in adopting and implementing regulations which permit it to *determine* dividend eligibility. I conclude, however, that the department was not authorized to proscribe dividend eligibility for a class of applicants who actually, or "arguably" as the court puts it, satisfy the presence and intent requirements. In other words, the department may not set up impediments to eligibility that go beyond those established by the legislature. For these reasons, I would hold that 15 AAC 23.615(d) is void as violative of AS 44.62.020 and AS 44.62.030, and I would affirm the superior court's decision.

## II

Ordinarily, there would be no need for me to proceed further. However, even accepting the court's view that AS 43.23.-015(a) granted the commissioner broad authority to pass regulations covering the subject matter of 15 AAC 23.615(d), I believe the court's decision seriously misrepresents federal immigration law. Therefore, in order to bring out what I believe are erroneous assumptions, I will presume that the department had the authority to promulgate 15 AAC 23.615(d) and that the only question is whether the regulation "adds a permissible gloss" to the statutory definition of state residency. *See* Maj.Op. at 625.

The department declared the Cosios ineligible to receive permanent fund dividends because they were not "resident aliens" or "refugees" and were therefore ineligible under 15 AAC 23.615(d). The department argues that its regulation is reasonable and consistent with AS 43.23.005(1) and AS 43.-

23.095(8) because an alien who does not have permanent resident or refugee status does not have the "legal ability to remain permanently in the state." Brief of Petitioner at 16. The department maintains that "any person without permanent residence status can be deported despite his wish to remain [in the state]." *Id.* at 10. Thus, the department concludes, non-resident aliens cannot "legally intend to do that which by law ... they are prohibited from doing." *Id.* (quoting *Juarrero v. McNayr,* 157 So.2d 79, 81 (Fla.1963)).

The court essentially agrees with the department that 15 AAC 23.615(d) simply infers "a requirement of lawful action from the statute." Maj.Op. at 625. The court then cites a case, *Simpler v. State Commercial Fisheries Entry Comm'n,* 728 P.2d 227, 230 (Alaska 1986), where we held that an agency may reasonably impute a lawfulness component into statutes when adopting regulations. The court states that it is entirely appropriate to assume "that the legislature did not intend to reward unlawful conduct." Maj.Op. at 625. It continues:

> It makes abundant sense to conclude that aliens who may not legally live in Alaska are not permanent residents for dividend purposes. To exclude such people from the permanent fund dividend program is consistent with public policy which regards it as unwise to reward illegality.

Maj.Op. at 625.

If it were, in fact, true that 15 AAC 23.615 excludes from dividend eligibility only those aliens who may not *legally live in Alaska,* then I would have to commend the common sense result which the court reaches today (if not the analysis it employs to reach it). However, a short examination of federal immigration law demonstrates that a regulation restricting dividend eligibility to citizens and immigrants with "resident alien" and "refugee" status is over-inclusive if its purpose is to avoid

**8.** I believe the court's reliance on *Whaley v. State,* 438 P.2d 718, 722 (Alaska 1968) is flawed precisely because the court never accounts for the fact that the rules and regulations in question in *Whaley* were of the type which implicated the Director of Personnel's expertise.

rewarding illegality.[9] In other words, immigrants without the specific immigration status listed in the regulation may still be present in Alaska legally and may "lawfully" have the subjective intent to remain in the state indefinitely.

A few examples suffice to make this point. Foreign diplomats or foreign fiancees of United States citizens may enter this country under non-immigrant visas and may subsequently petition the Immigration and Naturalization Service to adjust their non-immigrant status to permanent resident status so long as certain criteria are met. *See* 8 U.S.C. § 1255–1255a (1988 & Supp.1993). In fact, almost all classes of lawfully admitted non-immigrants may use the adjustment of status mechanism to gain permanent resident status. *Id.* Although most classes of non-immigrants would violate the terms of their visas and be subject to deportation if they had the subjective intent to remain permanently in the United States *at the time they entered the country*, the United States Immigration Code does not prohibit lawfully admitted non-immigrant aliens from subsequently petitioning the government to remain in the country indefinitely.[10]

In a case which is instructive in this regard, the United States Supreme Court held that aliens holding certain types of non-immigrant visas were not prevented, as a matter of federal law, from forming the intent necessary to establish state residence. *See Elkins v. Moreno et al.*, 435 U.S. 647, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978).[11] The court held:

> Under present law ... were a G–4 alien [i.e. an officer of a foreign governmental agency] to develop a subjective intent to stay indefinitely in the United States, *he would be able to do so without violating either the [Immigration] Act, the Service's regulations, or the terms of his visa.*

*Id.* 435 U.S. at 666, 98 S.Ct. at 1349.

Given this controlling federal precedent, I am at a loss to understand this court's position that 15 AAC 23.615(d) merely serves to impute a legality requirement into the statutory definition of "state resident." Under 15 AAC 23.615(d), a person could be lawfully admitted to this country, be physically present in Alaska for many years, form the subjective intent to remain permanently in the state (without violating federal immigration laws), and still be ineligible to receive a permanent fund dividend.[12] I do not believe this result is either consistent with or reasonably necessary to carry out the purposes of AS 43.23.005(a)

**9.** I assume that there is no dispute amongst my colleagues that the legality or illegality of which we speak is determined solely by federal law. The United States Constitution exclusively entrusts immigration matters to the federal government. *See Graham v. Richardson*, 403 U.S. 365, 378, 91 S.Ct. 1848, 1855, 29 L.Ed.2d 534 (1971).

**10.** Even aliens who enter this country without inspection or overstay a visa (i.e. those commonly referred to as "illegal aliens") have certain defenses to deportation available to them by federal statute. Those aliens who qualify may be granted withholding of deportation, suspension of deportation, temporary protected status, and asylum. *See* 8 U.S.C. §§ 1252–54a (1988 & Supp.1993). All of these remedies, if granted, will allow an alien to remain in this country indefinitely, as permanent residents. *Id.* Therefore, it is a doubtful proposition to say even of these aliens that they may not "lawfully" intend to remain in the country indefinitely.

**11.** Many state courts have similarly concluded that non-immigrant aliens have the capacity to form the intent necessary to establish "domicile" or "residency" for divorce purposes. *See Pirouzkar v. Pirouzkar*, 51 Or.App. 519, 626 P.2d 380 (1981); *Bustamante v. Bustamante*, 645 P.2d 40 (Utah 1982). Although this court has not passed on this issue, I do not read the majority opinion as holding that non-resident aliens are precluded, as a matter of state law, from forming the intent necessary to establish "residency." *See, e.g., Perito v. Perito*, 756 P.2d 895, 897–98 (Alaska 1988) (discussing the residency requirements under state law which are sufficient to establish a trial court's jurisdiction over a divorce).

**12.** To those who would argue that non-immigrant aliens only have to wait until the Immigration and Naturalization Service grants them permanent resident status to become eligible for dividends, I would point out that the adjustment of status process often takes many years to complete. Also, this argument erroneously assumes that those pursuing this option cannot "legally" intend to remain in the meantime.

and .095(8). *See* AS 44.62.030; *Zamarello*, 486 P.2d at 911. The regulation is therefore invalid. *Id.*

Non-resident immigration status is simply an unreliable indicator of an alien's legal ability to intend to remain in the state. While the department was entitled to consider the Cosios' immigration status as a factor in its "totality of the circumstances" review, it was not authorized to declare the Cosio's ineligible to receive dividends based solely on their immigration status.[13] I would therefore affirm the superior court's decision.

**13.** Because I would declare 15 AAC 23.615(d) invalid on statutory grounds, I do not believe this court needs to address the constitutional arguments raised by the parties. Accordingly, I take no position on the analysis the court today employs to uphold the constitutionality of the regulation.